STEVEN ASHERMAN *v.* LARRY MEACHUM,
COMMISSIONER OF CORRECTION
(13611)

PETERS, C. J., HEALEY, CALLAHAN, GLASS and HULL, Js.

Argued October 5—decision released November 28, 1989

*Stephen J. O'Neill,* assistant attorney general, with whom were *Peter E. Wiese* and *Steven R. Strom,* assistant attorneys general, and *Clarine Nardi Riddle,* attorney general, for the appellant-appellee (respondent).

*William J. Tracy, Jr.,* for the appellee-appellant (petitioner).

PETERS, C. J. The issue in this case is whether the due process rights of the petitioner, Steven Asherman, a convicted criminal, were violated by his transfer from supervised home release to a state correctional institution. The petitioner filed a petition for habeas corpus against the respondent, Larry Meachum, commissioner of the department of correction, seeking his release from confinement. After a hearing, the trial court granted the petition for a writ of habeas corpus and ordered the respondent either to return the petitioner to supervised home release or to discharge him from custody. The respondent obtained certification for

appeal pursuant to General Statutes § 52-470 (b),[1] whereupon the petitioner cross appealed. Pursuant to Practice Book § 4023, we transferred the appeal to this court. We find error and remand for the entry of judgment on behalf of the respondent.

This appeal constitutes the third case concerning this petitioner that has come to this court. In *State* v. *Asherman*, 193 Conn. 695, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985), we affirmed the petitioner's conviction of the crime of manslaughter in the first degree in violation of General Statutes § 53a-55 for the homicide of Michael Aranow. In *Asherman* v. *State,* 202 Conn. 429, 521 A.2d 578 (1987), we affirmed the denial of the petitioner's petition for a new trial that he had based on the grounds of newly discovered evidence and alleged juror misconduct. Although the petitioner has steadfastly maintained his innocence throughout these proceedings, the present posture of this case is that the petitioner has been definitively adjudicated to have committed a serious and brutal crime, and hence is lawfully incarcerated.

As a result of his conviction, the petitioner was sentenced, on April 29, 1980, to a term of imprisonment of not less than seven nor more than fourteen years. He began to serve his sentence on March 19, 1985. Despite a somewhat "shaky" psychiatric evaluation, the respondent, on December 7, 1987, granted the petitioner's application for supervised home release. Pur-

---

[1] General Statutes § 52-470 (b) provides: "No appeal from the judgment rendered in a habeas corpus proceeding brought in order to obtain his release by or in behalf of one who has been convicted of crime may be taken unless the appellant, within ten days after the case is decided, petitions the judge before whom the case was tried or a judge of the supreme court or appellate court to certify that a question is involved in the decision which ought to be reviewed by the court having jurisdiction and the judge so certifies."

suant to the terms attached by the respondent to the petitioner's request, the petitioner was first placed in a halfway house, where for three months he was supervised and counseled. Having obtained an approved apartment in West Hartford and employment at CIGNA Insurance Company, he was then permitted to live in the community, subject to the continued direction of his supervising officer, Jack Tokarz. From the end of March, 1988, when he moved into his apartment, the petitioner fully complied with all the rehabilitative programs to which he was assigned.

The petitioner was eligible for parole at the time that his application for supervised home release was under consideration, but the parole board did not hold a hearing on his parole application until July 19, 1988. The parole board denied the petitioner's application for three reasons: the seriousness of the petitioner's offense; the absence of a finding that he could live and remain at liberty without violating the law; and the absence of a finding that his release would be compatible with the welfare of society. The petitioner was informed of the denial of his parole application, and of the reasons therefore. He has not challenged the validity of the denial of his parole. See *Connecticut Board of Pardons* v. *Dumschat,* 452 U.S. 458, 463–67, 101 S. Ct. 2460, 69 L. Ed. 2d 158 (1981); *Greenholtz* v. *Nebraska Penal Inmates,* 442 U.S. 1, 7, 99 S. Ct. 2100, 60 L. Ed. 2d 668 (1979).

The denial of the petitioner's parole triggered a renewed concern about the appropriateness of the petitioner's home release status. The respondent testified that he would not have approved a request for home release if he had anticipated denial of the petitioner's application for parole. In the respondent's considered professional view, that denial could affect the propensity for flight of someone like the petitioner who, despite obvious intellectual gifts, had committed a hei-

nous crime. Recalling his previous uncertainty about the earlier "shaky" psychiatric evaluation of the petitioner, the respondent ordered Tokarz, the petitioner's supervising officer, to instruct the petitioner to report for an updated psychiatric reevaluation to be conducted on August 24 and August 25, 1988.

In response to this instruction, the petitioner's attorney wrote a letter to the respondent that is of crucial significance to these proceedings.[2] The letter protested the propriety of what counsel assumed to be a "reevaluation hearing," and noted that a habeas corpus peti-

[2] The text of the letter at issue from Attorney William J. Tracy, Jr., to Commissioner of Correction Larry Meachum, dated August 22, 1988, is reprinted in its entirety.

"I have been advised that my client, Mr. Steven Asherman, has been ordered to appear on Wednesday, August 24, 1988 and Thursday, August 25, 1988 from 9:00 A.M. to 5:00 P.M., before one or more state psychiatrists.

"To the best of my knowledge, this is an unprecedented procedure for an individual on community release in good standing. It is *not* one of the imposed conditions of his release. Mr. Asherman has already successfully completed the mental health program developed for him by your department. I can only assume, from recent published reports, that the purpose of this ordeal is to conduct, without notice, a re-evaluation hearing.

"Before Mr. Asherman was released, he underwent psychiatric evaluation on the order of the Deputy Commissioner of Field Services. This evaluation was considered in determining Mr. Asherman's eligibility for release.

"There has been [no] misconduct or even unusual behavior that would warrant ordering a re-evaluation at this late date. This unorthodox procedure is highly disruptive of Mr. Asherman's legitimate efforts to return to a normal life. He is being forced, on short notice, to miss two days of work at a crucial time for his employer plus provide the humiliating explanation that he has suddenly been instructed to undergo such an evaluation. The Department of Corrections is putting pressure on Mr. Asherman when support and encouragement have been earned.

"In addition, I have filed, on Mr. Asherman's behalf, a petition under 28 USC Section 2254 for a writ of habeas corpus in the United States District Court. The petition represents a substantial amount of work in connection with Mr. Asherman's continuing efforts to contest the substantial improprieties in the course of his trial. The petition is not related to the recent publicity; nevertheless, since we are finally at the stage of filing the petition, there are significant additional considerations related to the petition to cause me to instruct Mr. Asherman not to participate in any interrogation which is related to the crime for which he was charged. My research

tion challenging the legitimacy of the petitioner's conviction had recently been filed in federal court. It informed the respondent that the petitioner would not "participate in any interrogation which is related to the crime for which he was charged." It asked the respondent not to misconstrue the petitioner's "silence at this hearing" as anything other than compliance with the attorney's instructions. Upon receipt of this letter, the respondent cancelled the planned psychiatric examination. When the petitioner appeared at the time and place designated by the respondent, the petitioner was reincarcerated at the Hartford Community Correctional Center. The respondent took the position that the petitioner, through his agent, had refused to submit to a psychiatric evaluation and notified the petitioner that this refusal violated conditions 1 and 11 of his home release program.[3]

indicates clearly that Mr. Asherman's right to silence and right to counsel continue in that regard even after conviction.

"I have instructed Mr. Asherman to appear as ordered. I will appear with him.

"I sincerely hope you will not misconstrue Mr. Asherman's silence at this hearing, which will be in compliance with my instructions. As you are aware, Mr. Asherman has consistently demonstrated that he is more than willing to participate in all Department of Correction Rehabilitation Programs and cooperate with all legitimate proceedings.

"Please advise me if I have misconstrued the upcoming hearing as part of a revocation proceeding. Mr. Asherman has done nothing to warrant such an action.

"We earnestly request clarification as to the intentions of your department with respect to this case and the purpose of these most unusual procedures."

[3] The Community Residence Violation Report, dated August 24, 1988, stated in pertinent part:

"NATURE OF VIOLATION

"Condition #1: By virtue of a letter received by Commissioner Meachum, signed by your lawyer, William J. Tracy, Jr., which indicated that Mr. Asherman will not participate in any interrogation which is related to the crime for which he was charged. This is a violation of Condition #1 which states in part, 'You are to follow the instructions of his supervising officer.'

"Condition #11: Which states in part, '. . . that your release is not incompatible with the welfare of society. . .'. Mr. Asherman's commu-

The petitioner was preliminarily notified of the reasons for his reincarceration in conjunction with a hearing that was held with reference thereto on September 1, 1988. Although originally denominated a disciplinary hearing, it was subsequently recast as a classification hearing, because the only sanction sought by the respondent was a redetermination of the level of security appropriate for the petitioner's placement within the state's custodial facilities for convicted criminals.[4] At this hearing, at which the petitioner appeared personally, accompanied by a prison advocate but not by his private counsel, he reiterated his view that he did not understand the need for a new psychiatric evaluation and had refused to participate therein on the advice of counsel. As a result of this hearing, the petitioner was removed from home release status and reclassified to a medium or minimum security prison facility.

In a letter dated September 7, 1988, the respondent formally notified the petitioner of the reason why his transfer to supervised home release status was being suspended. The respondent noted that he had the statutory authority to review all inmates on home release status on a continuing basis. He reiterated his position that the denial of the petitioner's parole application warranted the department of correction's order to the petitioner to undergo a new psychiatric evaluation. The

nity release status was reviewed following the Connecticut Board of Parole's decision to deny parole. By virtue of Mr. Asherman's decision not to cooperate with a psychological evaluation, his parole denial, and its possible impact on him, it was determined that continued supervision in the community was incompatible with the welfare of society."

[4] Disciplinary proceedings, as distinguished from classification proceedings, consider misconduct that may lead to such sanctions as loss of good time credits. Reclassification proceedings, by contrast, may be triggered by changed circumstances that do not implicate misconduct on the part of the person on home release, such as the death of supporting family members or the relocation of an employer.

respondent stated that he found himself unable to ascertain the petitioner's continued suitability for home release status because of the petitioner's "refusal to fully participate in this psychiatric evaluation." As a result, the respondent had concluded that the petitioner was no longer an appropriate candidate for home release status. The letter closed by informing the petitioner that he would be afforded a classification hearing to determine the particular correctional facility in which he would be confined.[5]

The petitioner had previously, on the day of his initial reincarceration, filed a state court petition for a writ of habeas corpus alleging that his transfer to Hartford Community Correctional Center and reclassification to higher security violated his rights to due process under the United States and Connecticut constitutions. The trial court ruled in favor of the petitioner on this petition. In its memorandum of decision, the court first rejected the petitioner's broad claim to a constitutionally protected liberty interest in his continued participation in a supervised home release program, with the attendant due process protections that such a constitutionally grounded liberty interest would have implicated. The court accepted, however, his narrower claim that state regulations had created a legitimate expectation of a liberty interest that the respondent had failed to respect. On this latter ground, the court ordered the petitioner either to be returned to supervised home release or to be discharged from custody altogether.

---

[5] The letter from Commissioner of Correction Larry Meachum to Steven Asherman, dated September 7, 1988, states in relevant part: "Your conduct in this regard has denied me the opportunity to obtain information which is essential to my continuing authority to review your suitability for the privilege of home release. I am compelled therefore to conclude that you are no longer suitable for this status and I herewith transfer you to confinement within a correctional facility. You will be afforded a classification hearing to determine which facility will be selected."

The present appeal and cross appeal challenge each of the trial court's rulings of law. The respondent claims error in the court's conclusions that (1) state law has conferred upon the petitioner a liberty interest in his home release status, and (2) the procedures used to transfer the petitioner out of home release status violated the petitioner's rights to due process in a state created liberty interest. The petitioner, in his cross appeal,[6] maintains that the trial court erred in rejecting his claim that he had a constitutionally created liberty interest in retaining his home release status. We find error on the respondent's appeal, and no error on the cross appeal.

I

"[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey* v. *Brewer,* 408 U.S. 471, 481, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972); *Mathews* v. *Eldridge,* 424 U.S. 319, 324–25, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). In the present case, therefore, in order to determine to what due process protections the petitioner was entitled, we must ascertain whether home release status confers upon a post-conviction incarcerated person: (1) a constitutionally created liberty interest to maintain that status; (2) a state created liberty interest to maintain that status; or (3) no due process rights at all. The respondent concedes, sub silentio, that the procedures employed in this case would not satisfy the standards appropriate to a claimed violation of a constitutionally created liberty interest. Our first

---

[6] For the sake of convenience, we will refer to the petitioner's appeal as a cross appeal even though he does not claim that he is aggrieved by the judgment or decision from which the respondent has appealed. See Practice Book § 4005. The petitioner's claims of error should have been denominated as "alternate grounds upon which the judgment may be affirmed." See Practice Book § 4013 (a) (1) (A).

inquiry must be, therefore, whether the trial court erred in deciding that home release status, unlike probation, did not confer upon the petitioner a protected liberty interest inherent in the due process clause of the United States constitution or the parallel due process clause of our state constitution.[7] We find no error in this ruling.

The petitioner's claim that he was deprived of a constitutionally protected liberty interest rests on *Morrissey* v. *Brewer,* supra, 481–82, in which the United States Supreme Court held that the due process rights of a person on parole were to be measured according to this elevated standard. That court has thereafter ruled, however, that a prisoner's transfer from one place of confinement to another does not infringe or implicate a constitutionally protected liberty interest.

---

[7] Article fourteenth of the United States constitution provides in pertinent part: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law . . . ."

Article first, § 8 of the Connecticut constitution provides: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel; to be informed of the nature and cause of the accusation; to be confronted by the witnesses against him; to have compulsory process to obtain witnesses in his behalf; to be released on bail upon sufficient security, except in capital offenses, where the proof is evident or the presumption great; and in all prosecutions by indictment or information, to a speedy, public trial by an impartial jury. No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law, nor shall excessive bail be required nor excessive fines imposed. No person shall be held to answer for any crime, punishable by death or life imprisonment, unless on a presentment or an indictment of a grand jury, except in the armed forces, or in the militia when in actual service in time of war or public danger."

The petitioner's counsel in this case has articulated no basis for an argument that due process claims under the Connecticut constitution have substantially different meanings than under the United States constitution. See *State* v. *Brigandi,* 186 Conn. 521, 542, 442 A.2d 927 (1982); but see *Fasulo* v. *Arafeh,* 173 Conn. 473, 475, 378 A.2d 553 (1977).

*Olim* v. *Wakinekona,* 461 U.S. 238, 244–48, 103 S. Ct. 1741, 75 L. Ed. 2d 813 (1983); *Hewitt* v. *Helms,* 459 U.S. 460, 468–69, 103 S. Ct. 864, 74 L. Ed. 2d 675 (1983); *Montanye* v. *Haymes,* 427 U.S. 236, 242, 96 S. Ct. 2543, 49 L. Ed. 2d 466 (1976); *Meachum* v. *Fano,* 427 U.S. 215, 225–26, 96 S. Ct. 2532, 49 L. Ed. 2d 451, reh. denied, 429 U.S. 873, 97 S. Ct. 191, 50 L. Ed. 2d 155 (1976); see also *Kentucky Department of Corrections* v. *Thompson,* 490 U.S.     , 109 S. Ct. 1904, 1908–1909, 104 L. Ed. 2d 506 (1989); see generally L. Tribe, American Constitutional Law (2d Ed. 1988) § 10-10. The question before us, therefore, is whether the status of a person on home release more closely resembles that of a parolee or that of a person confined in a minimum security correctional institution.

For a number of reasons, we agree with the trial court that, under our statutes, the petitioner's status on home release is, in point of law, distinguishable from that of a person on parole. It is true that, in ordinary circumstances, a person on home release lives as independently, under as little daily supervision, as does a person on parole. Nonetheless, for a person on home release status, that supervision, as a matter of law, continues to be vested in the department of correction, just as it does for any incarcerated inmate. General Statutes § 18-100 (e). A person on parole, by contrast, is in the "custody and control" of the board of parole. General Statutes §§ 54-125, 54-129. Even more significant, the law distinguishes sharply between home release and parole in the consequences it assigns to absconding from supervision. For a person on home release, as for any incarcerated prisoner, absconding constitutes a new crime, escape, that may lead to an added prison term. General Statutes § 53a-169 (a) (2). For a parolee, however, the only sanction for absconding is that a parole violator risks his return to the cus-

tody of the commissioner of correction for the unexpired portion of the term of his original sentence. General Statutes § 54-128.

In analogous cases involving prisoners at halfway houses, or conditionally assigned to educational release or work release programs, courts have uniformly held that transfer or reincarceration does not implicate a constitutionally protected liberty interest. *Brennan* v. *Cunningham,* 813 F.2d 1, 5 (1st Cir. 1987); *Whitehorn* v. *Harrelson,* 758 F.2d 1416, 1420 (11th Cir. 1985); *Garcia* v. *De Batista,* 642 F.2d 11, 14 (1st Cir. 1981); *Jenkins* v. *Fauver,* 108 N.J. 239, 247, 528 A.2d 563 (1987); *People ex rel. Feliciano* v. *Waters,* 99 App. Div. 2d 850, 472 N.Y.S.2d 455 (1984); *Mitchell* v. *Meachum,* 770 P.2d 887, 889 (Okla. 1988). These cases lend persuasive support to the trial court's ruling in this case. We conclude, accordingly, that the petitioner had no constitutionally derived liberty interest.

## II

The trial court ruled in the petitioner's favor on the basis of two interconnected conclusions of law. The court first determined that state statutes, regulations and practices had so limited official discretion concerning the revocation of home release status as to confer upon the petitioner a liberty interest in the continuation of that status. *Vitek* v. *Jones,* 445 U.S. 480, 487–94, 100 S. Ct. 1254, 63 L. Ed. 2d 552 (1980) (transfer to a mental hospital); *Wolff* v. *McDonnell,* 418 U.S. 539, 557–58, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974) (loss of good time credits). The court then determined that the procedures attendant to the respondent's reclassification of the petitioner in this case had failed to afford him the due process protections to which he was entitled. Testing the reclassification procedures in accordance with the standards imposed by *Wolff* v. *McDonnell,* supra, 563–67, the court concluded that the

petitioner had not been afforded a meaningful hearing and was therefore entitled either to be returned to home release status or to be released from custody altogether.

The respondent contests both of these conclusions. He calls to our attention a recent decision of the United States Supreme Court; *Kentucky Department of Corrections* v. *Thompson,* supra, 1909–10; articulating a two-part standard by which a state created liberty interest is to be measured. Under that standard, a state created liberty interest requires a showing that the state has enacted (1) "substantive predicates" to guide the discretion of the decisionmaker and (2) regulations that contain "explicitly mandatory language" requiring that a particular result must be reached upon a finding that the substantive predicates have been met. Id. That case, which was not available to the trial court at the time that it rendered its judgment, makes the issue of a state created liberty interest in home release status an exceedingly close question. General Statutes § 18-100 (d), on its face, confers considerable latitude upon the respondent to suspend the home release status of a person "whose conduct [the commissioner] believes is unsuitable for the continuation of such privileges." The regulations promulgated to implement this section establish so-called "Conditions of Community Residence" that similarly authorize the commissioner to require unrestricted compliance with unspecified instructions of the supervising officer assigned to supervise a person on home release.

We need not resolve today the difficult question of whether the petitioner has established his entitlement to a state created liberty interest, because even if he had done so, he would still have to establish a violation of the due process rights that would flow from such an entitlement. We disagree with the trial court's conclusion that the procedures employed by the respon-

dent in this case failed to afford the petitioner the due process rights that a state created liberty interest would confer upon him.

The trial court correctly assessed the procedures that led to the petitioner's reclassification in accordance with the standards set out in *Wolff* v. *McDonnell,* supra. These standards require advance written notice, an opportunity to call witnesses and present evidence, and a written statement by the factfinder of the evidence relied upon and the reasons for the action taken. The trial court concluded that the respondent had provided the requisite notice, a statement of resolution and an evidentiary hearing. We agree with these conclusions. The crucial question, according to the court, was whether the hearing that was held was "a meaningful one based on evidence." Due process, under *Wolff* v. *McDonnell,* requires the findings of the factfinder to be "supported by some evidence in the record." *Superintendent* v. *Hill,* 472 U.S. 445, 454, 105 S. Ct. 2768, 86 L. Ed. 2d 356 (1985).

In assessing the alleged evidentiary insufficiency of the petitioner's reclassification proceeding, the trial court acknowledged that the respondent was empowered to make periodic assessments of the conduct of persons on home release status in order to ascertain their continued fitness to continue in this status without detriment to the welfare of society. General Statutes § 18-100 (d). Despite the petitioner's argument to the contrary, we agree that the authority to initiate such a reassessment is a reasonable exercise of governmental authority; *Thornburgh* v. *Abbott,* 490 U.S. , 109 S. Ct. 1874, 1882–83, 104 L. Ed. 2d 459 (1989); *Turner* v. *Safley,* 482 U.S. 78, 89, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987); that need not be conditioned upon a preliminary finding of misconduct or breach of condition by the petitioner. A change of circumstances entirely beyond the control of a person on home release,

such as the unforeseen death of a significant caretaker, may reasonably trigger an inquiry into current mental health. In this case, it was the denial of the petitioner's parole application that served to trigger concern about his suitability to retain his status on home release. There is no finding in this case that the respondent's issuance of an order for such a renewed inquiry on this ground was in any way pretextual or otherwise outside the appropriate bounds of his discretion. It hardly requires saying that an appropriate inquiry does not become inappropriate simply because the petitioner has elected to file a federal habeas corpus petition challenging the legality of his conviction.

The trial court nonetheless concluded that the respondent had adduced insufficient evidence to support his order returning the petitioner to custody. In the court's view, the respondent misconstrued the essential purport of the letter sent to the respondent at the time that the petitioner was ordered to appear for a psychiatric evaluation. Although the letter stated that the petitioner's counsel had instructed the petitioner "not to participate in any interrogation which is related to the crime with which he was charged," the court held that the letter revealed the petitioner's "willingness to participate in the requested psychiatric evaluation." In reaching this result, the court did not call into question the credibility of the respondent's testimony that he had construed the letter differently. The petitioner did not testify at the habeas hearing, so that his credibility was never at issue.

The trial court's conclusion of evidentiary insufficiency cannot stand. Once it is accepted that the respondent has the authority to order updated mental health reports for persons on home release status, it follows that the petitioner, having been notified of his obligation to report for a psychiatric evaluation, did not have the right unilaterally to predetermine the scope of such

an examination. The petitioner's insistence on such a right, even in reliance upon the advice of counsel, was conduct that constituted some evidence of his unsuitability for continuation on home release. It is noteworthy that the petitioner reiterated this refusal at the hearing held to reevaluate his custodial status. In *Superintendent* v. *Hill,* supra, 455–57, involving an inmate's loss of good time credits, the Supreme Court of the United States held that the requirement of "a modicum of evidence" is met if "there is any evidence in the record that could support the conclusion reached by the disciplinary board. . . . The fundamental fairness guaranteed by the Due Process Clause does not require courts to set aside decisions of prison administrators that have some basis in fact. . . . The Federal Constitution does not require evidence that logically precludes any conclusion but the one reached by the disciplinary board." See *Freeman* v. *Rideout,* 808 F.2d 949, 951–55 (2d Cir. 1986), cert. denied, 485 U.S. 982, 108 S. Ct. 1273, 99 L. Ed. 2d 484 (1988); see also *Zimmerlee* v. *Keeney,* 831 F.2d 183, 186 (9th Cir. 1987). Considering the evidence with a view to sustaining the findings that led to the petitioner's transfer to confinement in a correctional institution, we conclude that the respondent has produced the "modicum of evidence" that is constitutionally required.

There is error, the judgment of the trial court is set aside and the case is remanded to that court with direction to render judgment denying the petition.[8]

In this opinion the other justices concurred.

---

[8] The appeal in this case does not require us to rule on evidence produced at examinations and hearings subsequent to the proceedings that led to the judgment that is currently at issue.