**Steven M. ASHERMAN,**
**Plaintiff–Appellee,**

v.

**Larry MEACHUM, Commissioner, Connecticut Department of Corrections,**
**Defendant–Appellant.**

**No. 982, Docket 90–2530.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 29, 1990.
Decided May 1, 1991.

Stephen J. O'Neill, Asst. Atty. Gen., for the State of Conn. (Clarine Nardi Riddle, Atty. Gen., Steven R. Strom, Asst. Atty. Gen., Hartford, Conn., of counsel), for defendant-appellant.

William J. Tracy, Jr. (Furey, Donovan, Eddy, Kocsis, Tracy & Daly, P.C., Bristol, Conn., of counsel), for plaintiff-appellee.

Before OAKES, Chief Judge, and LUMBARD and CARDAMONE, Circuit Judges.

CARDAMONE, Circuit Judge:

Larry Meachum, Commissioner of the Connecticut Department of Corrections, takes an expedited appeal from an October 24, 1990 judgment entered in the United States District Court for the District of Connecticut (Burns, C.J.) granting appellee Steven Asherman's petition for a writ of habeas corpus. In his petition, Asherman asserted, *inter alia,* that his Fifth Amendment privilege against self-incrimination had been violated when the Connecticut Commissioner revoked his supervised home release (SHR) status.

The writ of habeas corpus has served as a bulwark protecting individual freedom in England and America for centuries. Among those rights that preserve the personal liberty of individuals under the law of England, Blackstone tells us, is the writ of habeas corpus, "to bring [that person's] body before the court of king's bench or common pleas; who shall determine whether the cause of his commitment be just, and thereupon do as justice shall appertain." 1 W. Blackstone, *Commentaries on the Laws of England* 131 (Univ. of Chicago Press 1979). The writ's "history and function in our legal system and the unavailability of the writ in totalitarian societies are naturally enough regarded as one of the decisively differentiating factors between our democracy and totalitarian governments." *Brown v. Allen,* 344 U.S. 443, 512, 73 S.Ct. 397, 449, 97 L.Ed. 469 (1953) (Frankfurter, J., concurring). This appeal illustrates that the Great Writ—that ancient buttress for individual liberty—is still alive and well.

## BACKGROUND

Petitioner was convicted of manslaughter in the first degree in 1980 in a Connecticut State Court after being found guilty of committing a particularly brutal crime, one in which the victim was stabbed over 100 times. He was sentenced to seven to 14 years imprisonment, and after pursuing a lengthy but ultimately unsuccessful appeal—during which time he was free on bond—he began serving his sentence on March 19, 1985. Thirty-three months later in December 1987, the Commissioner approved Asherman's application for community release, conditioning that privilege on petitioner undergoing drug-abuse and mental-health counseling, in addition to the usual conditions imposed on all releasees.

Asherman also signed a document entitled "Community Residence Agreement and Notification" that stated in pertinent part: "I understand and accept the Community Residence Program as a privilege and thereby may lose this privilege if and when the Commissioner of Corrections or his designee deams (sic) appropriate." The next month, January 1988, petitioner was placed in a halfway house. While there he completed the required drug and mental health counseling; in March he was placed in the supervised home release program (SHR) and began living in an apartment with his wife and working as a computer systems analyst. His release status was short-lived.

In July 1988 the Parole Board denied appellee's application for parole, citing the seriousness of the crime for which Asherman had been convicted, and its findings that there was no "reasonable probability" that he could remain at liberty without violating the law and his release would be incompatible with the public's welfare. A month later Asherman's supervisor ordered him to report to the Department of Corrections to undergo psychological evaluation scheduled for August 24 and 25 because the Commissioner believed that he might have reacted negatively to the denial of parole. Appellee's counsel wrote the Commissioner on August 22, 1988 seeking clari-

fication of the evaluation proceeding, informing him that there was pending a petition for a writ of habeas corpus in federal district court challenging his conviction (the petition was ultimately denied), Asherman would appear at the evaluation but would not answer questions related to his conviction. When petitioner reported to the Department of Corrections on August 24 he was taken into custody in the Hartford Correctional Center; he filed a petition for a writ of habeas corpus in state court the same day.

Asherman was subsequently charged in a disciplinary proceeding with violating the conditions of community residence based on his statement that he would not answer questions relating to the crime for which he had been convicted. After finding he had violated the conditions of his release, the disciplinary committee recommended that the classification committee review Asherman's classification status. Upon review the warden modified the disciplinary committee's "guilty" finding to a finding that Asherman was "not guilty" of a disciplinary violation, but the recommendation that Asherman's classification status be reviewed was upheld, and the entire proceeding was then recast as a classification hearing.

The classification committee later recommended that petitioner be returned to a medium or minimum security facility. The warden approved and Asherman was informed by a September 7, 1988 letter from Commissioner that stated in pertinent part

Your refusal to fully participate in th[e] psychiatric evaluation precludes me from obtaining information necessary to determine whether the denial of parole in and of itself had such an impact upon you that you no longer are a suitable person for home release status.

The absence of the information referred to ... above constitutes sufficient ground for determining that you no longer are a suitable person for home release status.

Your conduct in this regard has denied me the opportunity to obtain information which is essential to my continuing authority to review your suitability for the privilege of home release. I am compelled therefore to conclude that you are no longer suitable for this status and I herewith transfer you to confinement within a correctional facility....

On November 10, 1988 the Connecticut Superior Court ruled on Asherman's August 24, 1988 petition for a writ of habeas corpus. It decided he did not have a protected liberty interest in home release status under the Due Process Clause of the United States Constitution, but that the provisions of the Community Residence Agreement and Notification and the Conditions of Community Residence created such a liberty interest, and that the requirements of due process had not been met.

As a result, another administrative hearing was held on January 3, 1989—by order of the Superior Court the Commissioner did not participate—at which the warden determined that Asherman be reinstated to SHR status on January 12, 1989. On January 12, 1989 William A. O'Neil, then governor of Connecticut, directed that Asherman not be released, effectively staying the warden's determination. The Superior Court of Connecticut promptly granted Asherman's motion to terminate that stay. When the Connecticut Supreme Court affirmed the termination of the stay Asherman was released into the SHR program on May 7, 1989. On November 28, 1989 the Connecticut Supreme Court reversed the Superior Court's November 10 decision that Asherman had been reimprisoned in violation of due process. *See Asherman v. Meachum,* 213 Conn. 38, 566 A.2d 663 (1989). On December 19, 1989 he was reimprisoned.

In January 1990 petitioner filed the instant petition for a writ of habeas corpus in the United States District Court for the District of Connecticut. On May 4 the Commissioner moved unsuccessfully to dismiss it on the ground that Asherman had failed to exhaust his state remedies. Chief Judge Burns granted Asherman's May 22, 1990 motion for summary judgment and issued the writ on October 24, 1990 holding that though Asherman's due process, equal protection, and First Amendment rights

were not violated, his Fifth Amendment rights had been transgressed by his removal from SHR because the invocation of the Fifth Amendment had been given as the reason for his removal. She ordered that he be returned to SHR status. The Commissioner appeals from this order. We affirm.

## DISCUSSION

On appeal the Commissioner contends that (1) Asherman failed to exhaust his state court remedies with respect to his Fifth Amendment privilege, (2) Asherman waived his right to assert this constitutional argument, (3) his removal from SHR status was not violative of that right, and (4) a grant of summary judgment in petitioner's favor was improper. The Commissioner also contests appellee's assertion that the district court incorrectly denied his due process, equal protection, and First Amendment claims. Because we conclude petitioner exhausted his state court remedies, did not waive his right to assert Fifth Amendment protection, was removed from SHR status in violation of that constitutional right and was entitled to a grant of summary judgment, we need not reach or decide Asherman's other constitutional claims.

We dispose at the outset of the Commissioner's assertion that the district court erred in granting summary judgment because it disregarded unrefuted testimony, ignored evidentiary material, and made independent findings of fact. These claims are either unsupported by the record, or fail to demonstrate material facts as to which there is a genuine issue for trial. Thus, this argument fails. Fed.R.Civ.P. 56(e).

1. Sections 2254(b) and (c) provide as follows: (b) An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering

### I The Propriety of Federal Habeas Review of the Fifth Amendment Claim

The Commissioner forwards three arguments the gravamen of which are that the district court should not have considered Asherman's Fifth Amendment claim. He first contends that Asherman's Fifth Amendment claim was not sufficiently raised before the state courts and thus Asherman failed to exhaust his state remedies and therefore did not satisfy federal habeas corpus review requirements. The Commissioner next contends that the Connecticut Supreme Court's failure to address the Fifth Amendment claim should have prevented the district court from deciding it. The Commissioner also urges that Asherman waived the right to assert his Fifth Amendment claim by putting his mental health at issue.

### A. Exhaustion of State Remedies

■ Discussion begins with the federal habeas corpus statute, 28 U.S.C. §§ 2254(b) and (c) (1988),[1] which embodies the principle that "a state prisoner must normally exhaust available state judicial remedies before a federal court will entertain his petition for habeas corpus." *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971). The exhaustion doctrine simply means that the state courts must have the first chance to rule on a habeas petitioner's federal claims before a federal court may examine his state conviction. *See Daye v. Attorney General,* 696 F.2d 186, 191 (2d Cir.1982) (*en banc*). Comity between federal and state judicial systems working side by side to correct alleged violations of a prisoner's federal rights is embraced in the doctrine. *See Wilwording v. Swenson,* 404 U.S. 249, 250, 92 S.Ct. 407, 409, 30 L.Ed.2d 418 (1971).

such process ineffective to protect the rights of the prisoner. (c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

To satisfy the exhaustion requirement a habeas petitioner must have "fairly presented" the federal claim to the state courts, *Picard*, 404 U.S. at 275, 92 S.Ct. at 512, by setting forth all of the essential factual elements of his federal petition and by placing before the state courts substantially the same legal theories asserted in his federal petition. Although this standard is not stringent, and a petitioner need not cite chapter and verse of those constitutional precepts relied upon, *see Picard*, 404 U.S. at 278, 92 S.Ct. at 513, still he must allege enough to put the state court on notice of the federal nature of his claim. *See Daye*, 696 F.2d at 192.

An examination of the briefs Asherman submitted indicates that he fairly presented his Fifth Amendment claim to both the trial and appellate courts of Connecticut. The initial brief submitted to the Superior Court stated: "[n]or can the stated objections or refusal to discuss the particulars of the crime constitute a basis for revocation [of SHR status]," citing *Minnesota v. Murphy*, 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984), a leading Supreme Court case on the boundaries of the privilege against self-incrimination. His reply brief to the same court stated: "[i]t is submitted that the 'unsuitable conduct' of refusal to participate in the psychiatric evaluation is more accurately a complaint against Mr. Asherman's refusal to 'confess' and thus forego his rights in federal court."

Petitioner's brief to the Connecticut Supreme Court alerted that court to the federal nature of his claim in a section entitled "Even the Broadest Discretion May Not Be Used to Punish an Inmate for Refusing to Discuss an Offense While that Offense is the Subject of a Pending Federal Habeas Corpus Action." It stated "[e]ven where the Commissioner has otherwise unfettered discretion, his discretion may not be used to penalize a prisoner for exercising his Fifth Amendment privilege or for refusing to forego his judicial remedies," again citing *Murphy*.

This was sufficient to bring home to the Connecticut courts the federal impact of Asherman's claim. Both courts were directed to the factual elements of appellee's case—his assertion of the Fifth Amendment privilege and subsequent reimprisonment—and appropriate Supreme Court precedent. *See Daye*, 696 F.2d at 192 (State court is alerted to federal nature of habeas petition if cited to specific provision of the Constitution relied on in habeas petition or federal constitutional precedents).

### B. Evolving Rules Regarding Procedural Default

The Commissioner also contends that the failure of the Connecticut courts to discuss Asherman's Fifth Amendment claim undermines his federal habeas petition. Before analyzing appellant's contentions we think it helpful to trace the evolving rules governing federal review of a state prisoner's habeas petition. Recently, the Supreme Court declared that if "the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar," the federal claim cannot be considered on habeas review. *Harris v. Reed*, 489 U.S. 255, 263, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989), quoting *Caldwell v. Mississippi*, 472 U.S. 320, 327, 105 S.Ct. 2633, 2638, 86 L.Ed.2d 231 (1985). This decision changes past Supreme Court's habeas corpus jurisprudence in a marked manner.

Beginning with *Brown v. Allen*, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed.2d 469 (1953), the Supreme Court extended federal habeas review to state convictions. It rejected the argument that denial of certiorari on direct appeal or a state court's prior decision addressing the legal merits of a prisoner's federal constitutional arguments had any binding effect on a federal court's consideration of constitutional issues on habeas review. *Id.* at 457–60, 73 S.Ct. at 407–09. In *Daniels v. Allen*, 344 U.S. 443, 73 S.Ct. 437, 97 L.Ed. 469 (1953), decided with *Brown*, an important exception to the rule that federal courts are not bound by prior state court proceedings was recognized. The Court held that when a defendant commits a procedural default under state law, which prevents the state appellate courts

from hearing the case on the merits, such default bars defendant from raising on a federal habeas petition those issues the state courts never had an opportunity to address. *Id.* 344 U.S. at 486, 73 S.Ct. at 422.

The reach of federal habeas jurisdiction was further expanded by a holding that a procedural default under state law would only bar habeas review when the default was the result of an intentional or deliberate by-pass of state court remedies. *See Fay v. Noia,* 372 U.S. 391, 438–41, 83 S.Ct. 822, 848–50, 9 L.Ed.2d 837 (1963). Since *Fay,* habeas review began a slow retreat. The Supreme Court handed down decisions limiting access by convicted state prisoners to federal habeas review. *See, e.g., Teague v. Lane,* 489 U.S. 288, 305–16, 109 S.Ct. 1060, 1072–78, 103 L.Ed.2d 334 (1989) (new constitutional rules of criminal procedure not retroactive to cases on collateral review, and habeas cannot be used as a vehicle for challenges on novel constitutional grounds except in certain circumstances); *Stone v. Powell,* 428 U.S. 465, 494, 96 S.Ct. 3037, 3052, 49 L.Ed.2d 1067 (1976) (habeas review not available on Fourth Amendment challenges).

Among those decisions was *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), which effectively reversed *Fay,* holding that procedural default under state law constitutes an independent and adequate state ground that prevents federal habeas corpus review, absent a showing of cause for the default and prejudice resulting therefrom. *Id.* 433 U.S. at 90–91, 97 S.Ct. at 2508–09. The cause and prejudice exception maintained a narrow crack in what appeared to be a closing door to the federal courthouse for state prisoners who had procedurally defaulted. *See* Rosenberg, *Kaddish for Federal Habeas Corpus,* 59 Geo.Wash.L.Rev. 362, 372 & n. 68 (1991).

The advent of *Harris v. Reed,* 489 U.S. 255, 109 S.Ct. 1038, opened the federal courthouse door wider in order to make the rules concerning procedural default on direct review. In *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), the High Court had said that where there is ambiguity it will presume that state court decisions relied on federal law, thus permitting Supreme Court appellate review, unless the state court's opinion contains a " 'plain statement' that [its] decision rests upon adequate and independent state grounds." *Id.* at 1042, 103 S.Ct. at 3477. *Harris* adopted the same rule for cases on collateral review. 489 U.S. at 261–62, 109 S.Ct. at 1042–43.

We had in the meanwhile developed rules to decide where—in the face of a state court affirmance of a conviction without an opinion—federal courts had the power to review a habeas petition on the merits. *See, e.g., Hawkins v. LeFevre,* 758 F.2d 866, 873–74 (2d Cir.1985) (if under New York law no objection necessary to preserve claim, we held it unlikely that state court relied on procedural default); *Martinez v. Harris,* 675 F.2d 51, 54–55 (2d Cir.), *cert. denied,* 459 U.S. 849, 103 S.Ct. 109, 74 L.Ed.2d 97 (1982) (where state argued that defendant procedurally defaulted and state court affirmed without opinion, we presumed state court rested on procedural grounds, barring federal review; where prosecutor argued only merits then we presumed state court rested on merits permitting federal review; where state argued both, we presumed state court rested on the procedural default, unless that court indicated otherwise).

The uncertainty engendered by the *Martinez* rule's dependence on the arguments made by the parties became apparent in *Parron v. Quick,* 869 F.2d 87 (2d Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 171, 107 L.Ed.2d 127 (1989). In that case, which arose in New York, the petitioner failed to raise a speedy trial claim before trial. *Id.* at 88. We noted that if petitioner appealed his conviction on the theory that he was denied a speedy trial under state law, then the claim was procedurally barred under New York State law because it was not a fundamental right and petitioner was required to raise the objection before trial, which he failed to do. If, however, petitioner appealed his conviction on the theory that the failure to object constituted ineffective assistance of counsel, the claim was

not barred for federal court review because assistance of counsel is a fundamental right and no objection was necessary to preserve it. *Id.* at 89–90. The Appellate Division affirmed the conviction without opinion, forcing us to guess which claim was presented and which claim the Appellate Division rested on. We presumed that the speedy trial claim was the only one presented and concluded therefore that the Appellate Division rested its decision on procedural default, leaving the merits of the ineffective assistance claim unexhausted. *Id.* at 90.

■ *Harris* eliminates the guesswork. Rather than examining the parties' briefs in the state courts, we need only consider the state court decision itself. Moreover, we no longer need to concern ourselves with distinctions a state may draw between fundamental and statutory rights. Under *Harris* we must presume that if the state court does not plainly articulate its reliance on procedural default, the claim is not barred. Hence, a state court affirmance of a conviction without opinion may now be reviewed by a federal court on the merits. If the state court's decision clearly rests on the procedural default, we will not second-guess that decision—even when we might disagree as to whether the petitioner asserted a fundamental right—for we are not the arbiters of state law. *See Parron*, 869 F.2d at 89 (Constitution does not guarantee petitioner error-free state court decisions on matters of state law).

■ Applying *Harris* to this case, we conclude the Connecticut Supreme Court's silence regarding the Fifth Amendment claim does not preclude Asherman's federal habeas petition. Because the Connecticut Supreme Court, the last state court rendering a judgment, did not "clearly and expressly" state that its rejection of Asherman's Fifth Amendment claim rested on a state procedural bar, we must conclude it did not. *Harris*, 489 U.S. at 263, 109 S.Ct. at 1043; *Peterson v. Scully*, 896 F.2d 661, 663 (2d Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 3301, 111 L.Ed.2d 810 (1990).

## C. Waiver

■ The Commissioner further contends that the contents of Asherman's August 22, 1988 letter precipitated an inquiry into his mental health, and that such inquiry should not be now limited because he has raised the Fifth Amendment privilege against self-incrimination. We think the Commissioner misconstrues the focus of Asherman's position. He did not assert the privilege in order to limit inquiry into his mental health so that he might succeed at his administrative hearing. Instead, his August letter clearly sought to shield him from being compelled to respond to questions that he thought might be used against him were he to succeed in obtaining a writ of habeas corpus and face another trial of the charges against him. Asherman's letter to the Commissioner was an assertion of his Fifth Amendment privilege, not a waiver of it.

## II *The Merits of Asherman's Fifth Amendment Claim*

We turn now to the merits of appellee's Fifth Amendment claim. The Commissioner argues that even if the district court was not in error in reaching Asherman's Fifth Amendment claim it decided the merits of it incorrectly. Specifically, the Commissioner urges that it was permissible for him to have drawn an adverse inference from Asherman's letter, and that his decision thereafter to revoke petitioner's SHR status was not predicated solely on his assertion of a constitutional right.

■ The Fifth Amendment, made applicable to the states through the Fourteenth Amendment, states, in pertinent part, that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." The Supreme Court informs us that "the availability of the [Fifth Amendment] privilege does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites." *In re Gault*, 387 U.S. 1, 49, 87 S.Ct. 1428, 1455, 18 L.Ed.2d 527 (1967). The privilege "not only protects the individual against being involuntarily called as a

witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings," *Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 (1973). The privilege continues even after a person has been convicted of a crime. *See Murphy*, 465 U.S. at 426, 104 S.Ct. at 1141; *Ottomano v. United States*, 468 F.2d 269, 273–7 (1st Cir.1972), *cert. denied*, 409 U.S. 1128, 93 S.Ct. 948, 35 L.Ed.2d 260 (1973).

■ Unless the government offers immunity for a citizen's testimony, that testimony may not be compelled under threat of some type of sanction. *See Lefkowitz v. Cunningham*, 431 U.S. 801, 806, 97 S.Ct. 2132, 2136, 53 L.Ed.2d 1 (1977); *see also Murphy*, 465 U.S. at 434–39, 104 S.Ct. at 1145–49 (though state may not revoke probation for exercise of privilege, defendant's Fifth Amendment rights not violated because state probation revocation statute did not require him to choose between incriminating himself and jeopardizing his conditional liberty by remaining silent); *Turley*, 414 U.S. at 84–85, 94 S.Ct. at 325–36 (finding unconstitutional New York statute requiring public contractors either to waive immunity and testify concerning their state contracts or lose current and future contracts); *Uniformed Sanitation Men v. Commissioner of Sanitation*, 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968) (violation of Fifth Amendment to require public employees either to waive immunity and testify with respect to official conduct or lose their job); *Gardner v. Broderick*, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968) (same); *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967) (same); *United States v. Oliveras*, 905 F.2d 623 (2d Cir.1990) (violation of Fifth Amendment to deny defendant sentence reduction for acceptance of responsibility because of refusal to incriminate himself as to conduct included in dismissed counts for which immunity was not provided). There is good reason for granting immunity for compelled testimony. If there was no immunity to protect against giving such testimony, the government would be in a position to demand that a witness testify, and the witness would be at the mercy of what use the government might make of it. The witness' future would be left to mere chance—like hazarding everything on a throw of the dice—a risk so totally unacceptable as to account for the existence of the salutary immunity rule for compelled testimony.

■ There are nonetheless two sets of circumstances where the state may require testimony that might be incriminatory or may draw an adverse inference from the witness' refusal to testify. One is in a civil proceeding where the state provides immunity from prosecution, *see Baxter v. Palmigiano*, 425 U.S. 308, 316–17, 96 S.Ct. 1551, 1557–58, 47 L.Ed.2d 810 (1976); the other is where the witness' "silence in and of itself is insufficient to support an adverse decision [in the civil proceeding]." *Id.* at 317, 96 S.Ct. at 1557. In both situations the witness is not faced with the dilemma of either testifying—thereby risking criminal prosecution—or being penalized solely for asserting his constitutional privilege.

The Commissioner believes that petitioner's psychological evaluation hearing fits into the second category where an adverse inference from a defendant's silence is permissible, that is, Asherman's assertion of the privilege was not the sole basis of the revocation of his SHR status. Even were such an adverse inference permissible here, we would still be unable to adopt the Commissioner's view. Although the relationship between Asherman's assertion of his Fifth Amendment privilege and the revocation of his SHR status is not as direct as that found in the cases from *Garrity* to *Turley*—where the penalty for assertion of the privilege was statutorily mandated—it is nevertheless true that the sole reason for Asherman's loss of SHR status was his invocation of a constitutional right. Consequently, compulsion—the touchstone of Fifth Amendment transgression—is present.

To support this conclusion it is helpful to recount in detail the events leading to Asherman's loss of SHR status. The Commis-

sioner testified that the denial of Asherman's parole application triggered concern about the appropriateness of his SHR status and led to the decision to order a psychiatric evaluation. Upon receiving Asherman's letter asserting his Fifth Amendment privilege the examination was cancelled. On August 24, 1988 Asherman was ordered back into prison. Petitioner's assertion of the privilege was stated at that time as the basis for the charged disciplinary violations of conditions 1 (follow supervising officer's directions) and 11 of SHR (engaging in conduct bringing into question ability to remain law abiding), and he was found guilty of these violations at the September 1, 1988 hearing. It was not until September 2 that the "guilty" finding was modified to "not guilty" and the proceeding was recast from "disciplinary" to "classification."

The Commissioner's September 7 letter to Asherman fully explains the decision to revoke Asherman's SHR status and reimprison him. In his letter the Commissioner stated that Asherman's "refusal to fully participate" in the psychiatric evaluation prevented him from gathering information necessary to determine whether the denial of parole affected Asherman to the point that he was no longer a suitable person for SHR status and that the absence of that information constituted "sufficient ground for determining that [Asherman] no longer [is] a suitable person for home release status."

 In other words because Asherman elected to assert his Fifth Amendment privilege the Commissioner was unable to obtain necessary information. It is the absence of this information that the Commissioner focuses on as a sufficient basis to reimprison Asherman. An adverse inference was in fact drawn from Asherman's silence; he was initially reimprisoned because that silence was found to be a disciplinary violation. He remained imprisoned when his silence was reinterpreted as a sufficient basis to reclassify him. Asherman was forced to choose between remaining silent—with reimprisonment the end result—and forfeiting his Fifth Amendment privilege and responding to questions with the possible result that his testimony could be used against him if his writ of habeas corpus was granted and he was retried, or with the possibility the testimony could be used against him to prevent the granting of habeas relief.

 The Commissioner contends that, though an adverse inference may have been drawn from Asherman's silence, the decision to reimprison him was also based on other factors including (1) an earlier "shaky" psychiatric evaluation; (2) the disclosure of a drug and psychiatric history; and (3) a June 6, 1990 report indicating that he requires long-term supportive psychotherapy. These contentions are without merit.

The Commissioner did not learn of Asherman's drug and supposed psychiatric history until well after he made his decision to reimprison Asherman. The same is also true of the June 6, 1990 report, as is evident from its date. Neither of these factors can therefore be said to have served as a reason for the Commissioner's decision. Further, the Commissioner had access to the "shaky" evaluation when he decided to grant Asherman SHR status and was not sufficiently persuaded by it then to deny his application. Hence, this leaves Asherman's exercise of his Fifth Amendment privilege against self-incrimination as the sole reason for his loss of SHR status and, because immunity was not granted, the Commissioner's decision to revoke that status violated petitioner's constitutional rights. *See Baxter,* 425 U.S. at 317–18, 96 S.Ct. at 1557–58.

We add—in response to the Commissioner's concerns—that we do not mean to be understood to say that an inmate can dictate the rules by which a prisoner may legitimately have to undergo psychiatric evaluations. We merely hold that if the Commissioner wants to draw an adverse inference from an inmate's silence, the inmate must either be granted immunity from future prosecution or the decision to reimprison the inmate must not be based solely on his silence.

We also note the order of the district court directing that Asherman be returned to SHR under the same conditions as existed on August 1, 1988 does not prevent the

Commissioner from conducting a legitimate evaluation of Asherman's mental health. As the Supreme Court of Connecticut stated, "the authority to initiate such a reassessment is a reasonable exercise of governmental authority ... that need not be conditioned upon a preliminary finding of misconduct or breach of condition by [the inmate]. A change of circumstances entirely beyond the control of a person on home release ... may reasonably trigger an inquiry into current mental health." *Asherman,* 213 Conn. at 51–52, 566 A.2d 663. We simply hold that revocation of Asherman's SHR status must be done within constitutional constraints.

### CONCLUSION

Asherman's exercise of his Fifth Amendment privilege was the sole basis of the Commissioner's decision to revoke his SHR status. Since such order violated petitioner's constitutional rights, we affirm the order of the district court that granted him a writ of habeas corpus and returned him to SHR status.

Judgment affirmed.