**UNITED STATES of America, Appellee,**

v.

**George TAYLOR, Defendant–Appellant.**

**No. 289, Docket 94–1133.**

United States Court of Appeals, Second Circuit.

Argued Nov. 3, 1994.

Decided Feb. 7, 1995.

Thomas G. Dennis, Federal Public Defender, Hartford, CT, for defendant-appellant.

Deborah R. Slater, Asst. U.S. Atty., Hartford, CT (Christopher F. Droney, U.S. Atty., for the D. Conn., New Haven, CT, of counsel), for appellee.

Before LUMBARD, CARDAMONE, and MINER, Circuit Judges.

MINER, Circuit Judge:

Defendant-appellant George Taylor appeals from an order entered on February 10, 1994 in the United States District Court for the District of Connecticut (Nevas, J.) revoking his probation and imposing a two-year sentence of imprisonment. The district court concluded that Taylor's term of federal probation had not begun until he was released from Connecticut's supervised home release program, and therefore Taylor was still on probation when he tested positive for drug use. For the reasons set forth below, we affirm the order entered in the district court.

## BACKGROUND

On November 29, 1988, Taylor pleaded guilty to one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). He was sentenced by the district court on January 30, 1989 as follows:

> Defendant is hereby committed to the custody of the Attorney General or his authorized representative for imprisonment for a period of two years on Count One; execution of sentence of imprisonment is suspended forthwith and the defendant is placed on probation for a period of three years **to commence upon release from present period of confinement on State sentence.** (emphasis added)

At the time he was sentenced by the federal district court, Taylor was incarcerated in the Carl Robinson Correctional Center in Enfield, Connecticut on unrelated state drug charges.

On January 15, 1990, approximately one year after Taylor was sentenced by the district court, the Connecticut State Department of Correction transferred Taylor into the state's Supervised Home Release

("SHR") program. SHR was a statutorily created program designed to alleviate prison overcrowding by releasing prison inmates to their homes, under the supervision of the Department of Correction. *See* Conn.Gen. Stat. § 18–100(e); *see also Asherman v. Meachum,* 213 Conn. 38, 566 A.2d 663, 664 (1989). The Connecticut legislature has since discontinued the SHR program, at least with respect to new entrants.

Taylor served the remainder of his prison sentence in SHR. He then was released from the SHR program on June 12, 1992 upon the expiration of his state prison sentence, and the federal Probation Office began its supervision of Taylor on that date. On October 27, 1993, Taylor's Probation Officer filed a petition with the district court to revoke Taylor's probation on the basis of approximately twenty urinalysis tests that indicated the presence of cocaine and/or morphine. These violations were alleged to have occurred between November 4, 1992 and September 7, 1993.

Taylor made a motion to dismiss the petition on November 24, 1993, contending that the petition had been filed after his three-year period of federal probation had ended on January 15, 1993. Taylor argued that his "release from confinement" on his state sentence had occurred three years before, when he was transferred from the state correctional center into the SHR program. The district court heard argument on this issue on February 10, 1994, and, at that time, orally denied Taylor's motion to dismiss. The court stated:

> It was clearly the intent of the Court to have [Taylor's] three-year probationary period commence when he completed his obligation to the State of Connecticut. And the Court believes that his release to supervised home release is akin to, can be likened to a continuation of confinement but not within the four walls of the institution, but he's under the supervision of the Department of Correction where if he absconds, is subject to [a charge of] escape and can be rendered summarily into custody. So that for all those reasons, the motion is denied.

Taylor did not contest the allegations regarding positive drug tests during the period beginning in August and ending in October of 1993. The government did not pursue revocation on the basis of any violations alleged to have occurred prior to January 15, 1993, the date on which Taylor contends that his term of federal probation ended. The district court revoked Taylor's probation and sentenced him to imprisonment for the two-year term that the court originally had suspended. Taylor's sentence is to commence upon his release from the custody of the Connecticut Department of Correction, where he is again being held on new state charges, unrelated to his federal offense.

## DISCUSSION

The only issue before this Court is whether the district court erred in concluding that Taylor's "release from [his] present period of confinement" occurred on the date he was released from the SHR program, June 12, 1992. Taylor contends that he was released from confinement almost one and one-half years before, on January 15, 1990, when he was transferred from a state corrections facility into the SHR program. Whether a prisoner who has been transferred into Connecticut's supervised home release program has been released from "confinement" is a question of federal law that we review *de novo. See United States v. King,* 990 F.2d 190, 192 & n. 2 (5th Cir.1993).

In resolving this issue, it is helpful to view the SHR program in its proper context. Over the past decade, many jurisdictions, including Connecticut, have experienced dramatic increases in their prison populations. From 1985 to 1988, Connecticut's prison population more than doubled from approximately 8,000 to 17,000 offenders, resulting in severe prison overcrowding. *See Schildge v. Commissioner,* No. 51–61–36, 1991 WL 154212, at *3 (Conn.Super.1991). As a result of prison overcrowding, Connecticut, along with many other jurisdictions, began to experiment with intermediate punishments—those that fall between the traditional punishment of incarceration in a correctional facility and probation. *See generally* J. Michael Quinlan, *Intermediate Punishments as Sentencing Options,* 66 S.Cal.L.Rev. 217

(1992) (authored by former Director of the Federal Bureau of Prisons). Around the time Taylor was transferred to SHR, there were approximately 5,700 Connecticut prisoners serving their sentences in the SHR program. *Schildge,* 1991 WL 154212, at *3.

The decision to allow an inmate to participate in the SHR program rested in the discretion of the Department of Correction. *See* Conn.Gen.Stat. § 18–100(e) (1992); *see also id.* § 18–100b(a) (making certain types of felons ineligible to participate in SHR). With respect to inmates already participating in the SHR program, the Department of Correction is "empowered to make periodic assessments of the[ir] conduct ... in order to ascertain their continued fitness to continue in this status without detriment to the welfare of society." *Asherman,* 566 A.2d at 669. If the Department of Correction finds that the inmate's continued participation in the SHR program would be detrimental to society, the prisoner is returned to a correctional facility to serve the remainder of his or her sentence. Such a determination is possible even without a finding of misconduct on the prisoner's part. *Id.* at 666 & n. 4, 669. Because courts have held that a prisoner's transfer from SHR status back to incarceration in a correctional facility does not implicate a liberty interest protected by the Due Process Clause, prisoners have no constitutional right to a hearing before being sent back to prison. *See id.* at 666–67 (no liberty interest derived from the constitution); *Smith v. Liburdi,* 26 Conn.App. 254, 600 A.2d 17, 20 (1991) (no liberty interest created under Connecticut law).

Prisoners in the SHR program are permitted to live in their own residences in the community. *See Asherman,* 566 A.2d at 664. They are free to come and go as they please and to carry out normal day-to-day activities, subject only to standard conditions such as restrictions on travel outside the state, the requirement that they report periodically to supervising corrections officers, that they not violate any laws, and that they seek or maintain employment. *See, e.g., State v. Jemison,* 35 Conn.App. 1, 643 A.2d 1287, 1287–88 & n. 4 (1994); *Schildge,* 1991 WL 154212, at *2. A prisoner who fails to stay within the state or to report to his or her supervising corrections officer can be found guilty of the crime of escape and is subject to the imposition of an additional prison sentence for that crime. *See* Conn.Gen.Stat. § 53a–169(a)(2); *Jemison,* 643 A.2d at 1290.

In determining whether Connecticut's SHR program properly is considered a form of "confinement," it is also instructive to consider the Connecticut Supreme Court's opinion in *Asherman v. Meachum,* 213 Conn. 38, 566 A.2d 663 (1989). In that case, the petitioner alleged that his federal due process rights were violated by the Department of Correction's revocation of his SHR status and his transfer back to incarceration in a state correctional facility. *Id.* 566 A.2d at 666–67. In deciding whether the petitioner had a protected liberty interest in remaining in the SHR program, the state Supreme Court was required to ascertain "whether the status of a person on home release more closely resembles that of a parolee or that of a person *confined* in a minimum security correctional institution." *Id.* at 668 (emphasis added). *Compare Morrissey v. Brewer,* 408 U.S. 471, 481–82, 92 S.Ct. 2593, 2600–01, 33 L.Ed.2d 484 (1972) (constitutionally-derived liberty interest in retaining status of parolee) *with Hewitt v. Helms,* 459 U.S. 460, 468–69, 103 S.Ct. 864, 869–70, 74 L.Ed.2d 675 (1983) (no constitutionally-derived liberty interest implicated by prisoner's transfer from one place of confinement to another).

The *Asherman* court concluded that the status of a person on supervised home release more closely resembles that of a person confined in a minimum security prison. 566 A.2d at 667. In reaching this conclusion, it relied principally on two factors: (1) authority over the prisoner remains vested in the Department of Correction, rather than the Board of Parole, just as with any other prisoner serving a prison sentence; and (2) absconding from SHR constitutes a new crime of escape, whereas a parolee only faces revocation of parole. *Id.* at 667–68; *see Schildge,* 1991 WL 154212, at *2 ("Inmates classified to supervised home release are considered incarcerated inmates whose location of confinement is an approved community residence.").

Our review of Connecticut's SHR program persuades us that it is a type of confinement, and therefore that the district court correctly determined that Taylor's term of federal probation did not begin until his release from the SHR program. While in SHR, Taylor remained under the jurisdiction of the Department of Correction. Consequently, at any time prior to the expiration of Taylor's prison sentence, the Department of Correction could have removed Taylor from the program and incarcerated him in a state correctional facility. *See Asherman,* 566 A.2d at 669. Indeed, it is not uncommon for an inmate placed in SHR to be transferred back to a prison facility. *See Temelsiz v. Chernovetz,* No. 26–65–91, 1990 WL 270315, at *3 (Conn.Super.1990) (at least 400 prisoners were transferred from SHR back to prison during 1990). In fact, Taylor himself previously had participated in the SHR program, only to have been returned to prison for committing another crime while in the program. We therefore conclude that only when Taylor had completely served his prison sentence and left the jurisdiction of the Department of Correction, could he be said to have been "released from confinement." As a practical matter, we note that Taylor's federal probation status should not turn on his status as a participant in the SHR program, a status that may change from time to time.

In determining that Taylor remained in confinement while in the SHR program, we rely also on the fact that significant limitations were placed on Taylor's liberty. While the conditions of Taylor's home release were less restrictive than confinement in prison, Taylor was still obliged to maintain or seek employment, report regularly to his supervising corrections officer, and stay within the state. If Taylor attempted to escape from his confinement—either by fleeing the state or by failing to report to his supervising corrections officer—he could be convicted of a separate criminal offense and sentenced to an additional prison term for his misconduct. If Taylor failed to comply with the other conditions of his release, he would be returned to a correctional institution.

We also note that construing confinement to encompass Taylor's placement in SHR also comports with the intent of the sentencing court. "The intent of the sentencing court must guide any retrospective inquiry into the term and nature of a sentence." *United States v. Einspahr,* 35 F.3d 505, 506 (10th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 531, 130 L.Ed.2d 434 (1994). Thus, to the extent that there is any ambiguity in applying the term "release from confinement" to a prisoner in Connecticut's SHR program, we properly may consider the sentencing judge's subjective intent. *United States v. O'Brien,* 789 F.2d 1344, 1347 (9th Cir.1986). Here, the record indicates that the sentencing judge did not contemplate Taylor's transfer to SHR. Moreover, the district judge stated that, by sentencing Taylor to a three-year term of probation "to commence upon release from present period of confinement," he intended to have the probation period start only after the state prison sentence imposed was fully served.

## CONCLUSION

We agree with the district court that Taylor was on federal probation at the time of his violations and therefore affirm the order of the district court revoking his probation and imposing sentence.