## STATE OF CONNECTICUT *v.* TIMOTHY WHITFIELD
## (10040)

DUPONT, C. J., SPALLONE and LAVERY, Js.

Argued September 11—decision released October 11, 1991

*Bruce A. Sturman,* public defender, with whom, on the brief, was *Gilbert Shasha,* for the appellant (defendant).

*John Paul Pannone,* assistant state's attorney, with whom, on the brief, was *C. Robert Satti, Sr.,* state's attorney, for the appellee (state).

LAVERY, J. The defendant appeals from the denial of his motion to suppress evidence pursuant to General Statutes § 54-94a.[1] The defendant was convicted of possession of cocaine with intent to distribute in violation of General Statutes § 21a-277 (a). Prior to trial, the defendant made a motion to suppress the cocaine seized from him, which was denied. The defendant then entered a conditional plea of nolo contendere. The defendant was sentenced to a four year term of imprisonment to run consecutive to a prior sentence, for an effective sentence of sixteen years, suspended after nine years, with three years probation. The sole issue in this appeal is whether the motion to suppress evidence was properly denied by the trial court.

On September 2, 1989, Officers William C. Naholnik and Robert Strohl, Jr., of the Waterford police department responded to a call of a disturbance at a toy store at the Crystal Mall. Employees of the store gave the officers a description of five individuals who were involved in the disturbance, which was created by an air rifle being pointed at people and fired. Strohl remained at the store while Naholnik went to look for the five individuals in the mall. The defendant was one

---

[1] General Statutes § 54-94a provides in pertinent part: "When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress evidence based on an unreasonable search or seizure . . . the defendant after the imposition of sentence may file an appeal within the time prescribed by law. The issue to be considered in such an appeal shall be limited to whether it was proper for the court to have denied the motion to suppress . . . ."

of the five. When Naholnik located the individuals, one of them was carrying a shopping bag from which the barrel of an air rifle was protruding. After Naholnik examined the air rifle and determined that it was non-lethal and legally purchased, he returned it to its owner. The officer then asked the five to return to the toy store with him to resolve the complaint. They agreed. Naholnik testified that none of the five was under arrest, nor did he search anyone.

Naholnik and the five returned to the store, where they were met by Strohl and mall security personnel. The officers conducted a records check, which revealed no active arrest warrants for any of the five. It was decided that no criminal charges would be pressed, but the mall security personnel requested that the police officers accompany the five to the mall security office, where the security officers would issue a written disbarment to the five. A written disbarment would forbid them from returning to the mall.

During the records check, the names of the five were broadcast over the police radio. An officer on unrelated duty, upon hearing the name of the defendant broadcast on the radio, radioed to Strohl and Naholnik that he was aware that the defendant had been convicted of a narcotics offense. The officer further stated that he suspected that the defendant must have been released on probation or some other sort of release.

Outside the mall, Officer Patrick Chao responded as a backup to Strohl and Naholnik. Chao parked his cruiser in such a manner that he had an unobstructed view, through a glass door, into the hallway adjacent to the mall security office. Chao saw Naholnik and four of the five, including the defendant, in the hallway. Naholnik testified that, while waiting in the hallway, the defendant's demeanor was good, and that all of the individuals were very cooperative. Strohl and mall

security personnel were in the security office with the other individual. Chao testified that Naholnik appeared to be "real hot and warm in there,"and that he saw Naholnik unbutton his coat, remove his hat and wipe his brow. The individuals with Naholnik, however, made no attempt to unbutton their coats or remove their winter hats. From prior experience, Chao knew that narcotics dealers would often hide narcotics in hats similar to those being worn by the individuals with Naholnik. This knowledge, combined with the prior radio transmission regarding the defendant's drug conviction and Chao's opinion that the individuals were acting "really nervous" as they looked out at his police cruiser, led him to request via police radio that Naholnik check their hats for contraband.

Naholnik asked the four to remove their hats. They all did so, with the exception of the defendant. The officer again asked the defendant to remove his hat. Naholnik testified that the defendant then removed his hat and threw it at him. When the hat fell to the ground, Naholnik saw a plastic bag containing several smaller bags inside it, filled with what he believed to be cocaine. As the officer bent over to pick up the hat and the plastic bag, the defendant pushed him against the wall and fled from the hallway. The defendant was subsequently apprehended and arrested.

Parole Officer Joseph Garibaldi of the department of correction testified that, on the date of the incident and for approximately three months before, the defendant was under his supervision pursuant to the supervised home release program. Under this program, the defendant was allowed to serve his sentence for a prior conviction in the community, subject to certain conditions. The defendant signed a document entitled "Conditions of Community Release" during the course of the process that led to his release from the correctional facility. The document set forth twenty-one conditions

of his release. Among the conditions were that (1) the defendant was still considered to be an inmate of the department of correction and was responsible for conforming to the rules of the department, (2) a failure by the defendant to report to his parole officer would be regarded as the crime of escape, (3) the defendant would not at any time use, or have in his possession or control, any illegal drug or narcotic, and (4) the defendant would abide by all conditions of his release. Garibaldi testified that while on supervised home release, the defendant was considered to be in the custody of and subject to search by the department of correction. He stated that, wherever the defendant was present, that place was merely an extension of the correctional facility. There was no evidence presented to indicate that on December 2, 1989, the Waterford police were aware that the defendant was on supervised home release.

The trial court denied the defendant's motion to suppress, indicating that Naholnik had a reasonable and articulable suspicion of criminal activity, and ruling that the search of the defendant's hat was reasonable, particularly since the defendant was a prisoner on supervised home release.

I

In denying the defendant's motion to suppress, the trial court considered the defendant's status as a participant in the department of correction's supervised home release program. In its oral memorandum of decision, the court noted that, since the defendant was on supervised home release, his rights against unreasonable search and seizure "certainly don't reach the level of any other individual." Indeed, since the rights of an individual on supervised home release are unique in that they lie somewhere between those of a parolee and those of an incarcerated inmate, it is helpful to com-

pare the consequences of home release status to those of parole and imprisonment.

The status of a participant in the department of correction's supervised home release program is distinguishable from that of a person on parole. *Asherman* v. *Meachum,* 213 Conn. 38, 48, 566 A.2d 663 (1989). As our Supreme Court pointed out, supervision of the home release participant continues to be vested in the department of correction, as it is for someone who is incarcerated. Id. Conversely, a person on parole is considered to be in the custody and control of the board of parole. Id. If a participant in the supervised home release program flees from the supervision of the department of correction, he is guilty of the crime of escape and subject to the imposition of an additional sentence. *State* v. *Lubus,* 216 Conn. 402, 406, 581 A.2d 1045 (1990). In contrast, if a parolee does not comply with the supervisory conditions of his parole, he is merely returned to the custody of the department of correction for the remainder of his original sentence. *Asherman* v. *Meachum,* supra, 48–49.

The status of a participant in the supervised home release program is also distinguishable from that of someone actually in prison. As Garibaldi testified, an individual on supervised home release is simply serving his sentence in the community, and wherever the individual is present is an extension of the correctional facility. In many respects, however, an individual on supervised home release is more like a parolee than someone who is incarcerated. First, parolees do not enjoy absolute liberty under the United States constitution, but only conditional liberty, dependent on their compliance with the conditions of their release. *Morrissey* v. *Brewer,* 408 U.S. 471, 480, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972); *State* v. *Smith,* 207 Conn. 152, 165, 540 A.2d 679 (1988). Similarly, a person on supervised home release has only conditional liberty, subject

to the conditions contained in the "Conditions of Community Release," which he signs in connection with his release. Also, many of the rules that are necessitated by the housing of large numbers of prisoners in one location are not important in the supervised home release context. See *Morrissey* v. *Brewer,* supra, 495. Finally, although individuals on supervised home release have only conditional liberty and are subject to searches with lesser constitutional protection than the average citizen, the ability to search does not extend to all law enforcement officials. As with a parolee, only the individual's parole officer has the right to search him when there is a mere suspicion that the individual may be violating the terms of his release. *People* v. *Coffman,* 2 Cal. App. 3d 681, 689, 82 Cal. Rptr. 782 (1969); *People* v. *Way,* 319 N.Y.S.2d 16, 21, 65 N.Y. Misc. 2d 865 (1971).

In the present case, Naholnik was bound to honor the defendant's constitutional rights to the same degree as those of any other citizen. The scope of the defendant's consent contained in the "Conditions of Community Release" is not broad enough to render the search of his hat valid. Naholnik was not working with Garibaldi nor did he have knowledge of the defendant's status as a supervised home release participant at the time of the search. Accordingly, the trial court's finding that Naholnik's search of the hat was reasonable based on the defendant's status as a participant in the supervised home release program was improper.

## II

We will now review the trial court's denial of the defendant's motion to suppress evidence independent of the defendant's home release status. The court found that Naholnik's search of the defendant's hat was justified by a reasonable and articulable suspicion of criminal activity. " 'The trial court's conclusions must stand

unless they are legally and logically inconsistent with the facts.' " *State* v. *Cofield,* 220 Conn. 38, 44, 595 A.2d 1349 (1991); *State* v. *Lasher,* 190 Conn. 259, 267, 460 A.2d 970 (1983).

It is well settled under both the United States and Connecticut constitutions that a police officer is allowed to detain an individual briefly for investigative purposes if the officer has a reasonable and articulable suspicion of criminal activity by the individual. *Alabama* v. *White,* 496 U.S. 325, 330, 110 S. Ct. 2413, 110 L. Ed. 2d 301 (1990); *Terry* v. *Ohio,* 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); *State* v. *Lamme,* 216 Conn. 172, 176, 579 A.2d 484 (1990); *State* v. *Mitchell,* 204 Conn. 187, 194, 527 A.2d 1168, cert. denied, 484 U.S. 927, 108 S. Ct. 293, 98 L. Ed. 2d 252 (1987); *State* v. *Anderson,* 24 Conn. App. 438, 443, 589 A.2d 372 (1991). In justifying the particular intrusion, " ' "[t]he police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry* v. *Ohio,* supra, 21.' " *State* v. *Cofield,* supra, 45.

In order to determine whether a reasonable and articulable suspicion exists such as to justify a stop based on *Terry* v. *Ohio,* supra, and its progeny, courts must consider the totality of the circumstances. *United States* v. *Cortez,* 449 U.S. 411, 417–18, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981); *State* v. *Aillon,* 202 Conn. 385, 399, 521 A.2d 555 (1987). At the suppression hearing, the evidence showed that Strohl and Naholnik were called to the toy store to respond to a disturbance. After they discussed the matter with store employees and got descriptions of the individuals responsible for the disturbance, Naholnik went into the mall to locate them. When Naholnik located the five, stopped them, and examined the air rifle, he was clearly justified in his actions, acting pursuant to a reasonable and articulable suspicion of criminal activity. This reasonable and

articulable suspicion ceased, however, after Naholnik had satisfied himself that the defendant had not committed any crime.

The state argues, and Naholnik testified, that the five were free to leave at that point since they were not placed under arrest. They were never actually told, however, that they were free to leave before they were escorted by the police officers and mall security to the security office. The test for a seizure is whether "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States* v. *Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497; *State* v. *Cofield*, supra, 46; *State* v. *Martin*, 2 Conn. App. 605, 611, 482 A.2d 70 (1984), cert. denied, 195 Conn. 802, 488 A.2d 457, cert. denied, 472 U.S. 1009, 105 S. Ct. 2706, 86 L. Ed. 2d 721 (1985). The five individuals were escorted by the police officers to the security office. They were not told that they were free to leave. This is evidence of authority strong enough to have led a reasonable person to believe that he was not free to leave. See *United States* v. *Mendenhall*, supra. As a result, the defendant was seized for an investigative detention at some point before he threw his hat at the officer, revealing the cocaine. At that point, his rights against unreasonable search and seizure guaranteed by the fourth and fourteenth amendments to the United States constitution were again implicated. *State* v. *Cofield*, supra.

It was Chao[2] who was suspicious of the individual's behavior. Chao saw Naholnik unbutton his coat, take

---

[2] It is proper to examine the collective information available to all the police personnel in order to determine whether the suspicion of the officer conducting the search was reasonable and articulable. *State* v. *Mitchell*, 7 Conn. App. 46, 58, 507 A.2d 1017 (1986), rev'd on other grounds, 204 Conn. 187, 527 A.2d 1168, cert. denied, 484 U.S. 927, 108 S. Ct. 293, 98 L. Ed. 2d 252 (1987).

off his hat, and wipe his brow while the defendant and his companions kept their hats and coats on. Chao knew from past experience that drugs were often secreted in the type of hat that the individuals were wearing, and radioed to Naholnik to check their hats. Naholnik, however, testified that the defendant was very cooperative and exhibited a good demeanor. Naholnik did not perceive it as out of the ordinary that the defendant and the other three individuals did not remove their coats and hats while waiting in the hallway on a December day. The hallway led directly to the outside, with only the glass door through which Chao looked as a barrier. We accept the facts as the trial court found them. The defendant had a prior narcotics conviction, and kept his hat on while in the mall on a December day. Chao observed that Naholnik was hot inside the mall. Chao also knew from past experience that drugs were often secreted in the defendant's type of hat. We conclude that, although Chao did have a suspicion, as a matter of law the facts are insufficient to form the basis for a reasonable and articulable suspicion. Consequently, the search of the defendant's hat was not justified under *Terry* and its progeny.

In *State* v. *Edwards,* 214 Conn. 57, 71, 570 A.2d 193 (1990), our Supreme Court examined the *Terry* stop and its limits. "[C]ertain seizures are justifiable under the Fourth Amendment if there is articulable suspicion that a person has committed or is about to commit a crime." *Florida* v. *Royer,* 460 U.S. 491, 498, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983); *State* v. *Edwards,* supra. "One function of a constitutionally permissible *Terry* stop is to maintain the status quo for a brief period of time to enable the police to investigate a suspected crime. . . . Determination of the means that are reasonably necessary to maintain the status quo necessarily depends upon a fact-bound examination of the particular circumstances of the particular govern-

mental intrusion on the personal security of a suspect." *State* v. *Braxton,* 196 Conn. 685, 689, 495 A.2d 273 (1985).

The defendant does not contest that the Waterford police had a reasonable and articulable suspicion that justified detaining him briefly. The defendant claims that the constitutionally permissible scope of the *Terry*-type detention was exceeded after Naholnik satisfied himself that the defendant and his four companions had committed no crime and, along with the mall security forces, escorted the defendant and his companions to the mall security office so that the mall security officers could give the defendants and his companions written notice not to return to the mall. Using the *Mendenhall* standard, the defendant and his companions did not believe they were free to go. The defendant's seizure exceeded the scope of the permissible stop and required a probable cause standard for the search of the hats. "A *Terry* stop that is justified at its inception can become constitutionally infirm if it lasts longer or becomes more intrusive than necessary to complete the investigation for which the stop was made." *State* v. *Mitchell,* supra, 197; *State* v. *Edwards,* supra, 72. In addition, *Brown* v. *Texas,* 443 U.S. 47, 51, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979) requires "reasonable suspicion, based on objective facts, that the individual is involved in criminal activity." The original stop was based on a disturbance in the mall with an air rifle. The question of drugs never arose. The officer may have had a suspicion when he sought a search of the defendant's hat but it was not reasonable based on objective facts, and did not provide probable cause. See *United States* v. *Sokolow,* 490 U.S. 1, 11, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989).

The judgment is reversed and the case is remanded with direction to grant the motion to suppress.

In this opinion the other judges concurred.