BENJAMIN REID *v.* COMMISSIONER OF
CORRECTION
(AC 24947)

Schaller, Dranginis and Bishop, Js.

Argued October 25, 2005—officially released January 10, 2006

*Jeffrey C. Kestenband*, for the appellant (petitioner).

*Terrence M. O'Neill*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Rebecca Rodriguez*, legal intern, for the appellee (respondent).

*Opinion*

SCHALLER, J. The petitioner, Benjamin Reid, appeals from the judgment of the habeas court denying his petition for a writ of habeas corpus. On appeal, the petitioner claims that the court improperly concluded that the condition of his parole that his release not be "incompatible with the welfare of society" was not void for vagueness and therefore constitutional. We affirm the judgment of the habeas court.

The following facts and procedural history are germane to our discussion. In 1957, the petitioner was convicted of murder and sentenced to death. His death sentence was commuted to life in prison and, in 1985, the petitioner was released on parole. On November 19, 1985, the petitioner signed a document that set forth the conditions of his parole. Paragraph eleven of the document stated: "Your release on parole is based upon the conclusion of the Parole Panel that there is a reasonable probability that you will live and remain at liberty

without violating the law and that your release is not incompatible with the welfare of society. In the event that you engage in conduct in the future which renders this conclusion no longer valid, then your parole will be revoked or modified accordingly."[1] The terms of the petitioner's parole permitted him to reside in the commonwealth of Massachusetts. He complied with the conditions of his parole for several years.

In April,1996, the petitioner was introduced to Karen Bryant, an ordained elder in the United Methodist Church and the pastor of the Church of All Nations in Boston, Massachusetts. The petitioner attended a counseling session with Bryant. Her initial impressions were that the petitioner was a "very sweet, gentle, humble, scared, vulnerable, confused human being who needed help." The petitioner, however, had not revealed to Bryant the extent of his criminal history. At the end of the session, Bryant invited the petitioner to attend her church and to participate in various activities, such as group sessions and prayer meetings.

The petitioner falsely informed Bryant that soon he would be a "free man . . . ." He claimed to be terrified

---

[1] General Statutes § 54-125 provides in relevant part: "Any person confined for an indeterminate sentence, after having been in confinement under such sentence for not less than the minimum term, or, if sentenced for life, after having been in confinement under such sentence for not less than the minimum term imposed by the court, less such time as may have been earned under the provisions of section 18-7, *may be allowed to go at large on parole in the discretion of the panel of the Board of Pardons and Paroles for the institution in which the person is confined, if (1) it appears from all available information, including such reports from the Commissioner of Correction as such panel may require, that there is reasonable probability that such inmate will live and remain at liberty without violating the law and (2) such release is not incompatible with the welfare of society.* Such parolee shall be allowed in the discretion of such panel to return to his home or to reside in a residential community center, or to go elsewhere, upon such terms and conditions, including personal reports from such paroled person, as such panel prescribes, and to remain, while on parole, in the legal custody and control of the board until the expiration of the maximum term or terms for which he was sentenced. . . ." (Emphasis added.)

by the thought of living without the oversight of his parole conditions. At that point, the petitioner had been living in a homeless shelter, and asked Bryant to hold $600 that he had received so that it would not be stolen.[2] Bryant agreed to that request and, because several thefts had occurred at the church, placed the petitioner's money in her personal bank account.

Bryant then noticed a change in the petitioner. He began to form an "obsessive" attachment to her.[3] For example, the petitioner would stop by the church on a daily basis to see her and tell her that "God sent [her] to be [his]." He presented her with gifts of flowers and perfume. Finally, although it was common behavior for the individuals in the church to hug one another, the petitioner intensified his physical contact with Bryant and would touch her "waist and down below . . . ." Bryant indicated to the petitioner that this type of physical contact was inappropriate and not acceptable.[4] The petitioner's unwarranted touching reached its apex during the week of May 13, 1996, during an incident in Bryant's office. As the two began to hug, the petitioner placed his hands on Bryant's buttocks and thrust his pelvis into her, so as to simulate sexual intercourse.

[2] The petitioner had indicated that because he was homeless, he was unable to open a bank account.

[3] Bryant testified that the petitioner would become agitated and angry when she spoke with other members of the church. On one occasion, he came to the church only to learn that Bryant had an appointment with another individual. The petitioner sat in the lobby "scowling" at Bryant for an hour and questioned why she was not his and why she was not available when he wanted to see her.

[4] Bryant subsequently learned of another incident concerning inappropriate touching involving the petitioner. Members of the church would go to a local food bank on a weekly basis and transfer 1600 pounds of food from the food bank to the church. A member of another organization that also worked with the food bank filed a formal complaint against the petitioner. She alleged that he had touched her inner thigh on several occasions and made "funny faces" when she told him to stop. The woman was forced to leave in order to make him stop. As a result of that complaint, the petitioner was not allowed to return to the food bank.

Bryant immediately separated from the petitioner and told him that he had to leave. The petitioner smiled strangely and stated, "That's all right babe, I will wait for you to know."

The petitioner displayed hostility toward Bryant following her return from a three day conference in Maine. Bryant noticed the change in the petitioner following her business trip. She described him as "deadly cold." The petitioner made statements to Bryant that caused her to be concerned for her safety. Specifically, he stated: "You fucking bitch, your ass is grass, I see how it is. I promise I'm going to bring you down. You are history." He expanded on that by telling her that he was "going to bring [her] down by the end of the week" and promised her that she was going to suffer. Bryant informed the petitioner that he was threatening her life and causing her to be frightened. She told him that if he did not cease such conduct, she would be forced to inform the police department. She reminded the petitioner of the likely effect that would have on his status as a parolee. The petitioner responded: "You go right ahead and call the police and put me in prison. I do not care what happens to me. I am not happy in prison or out of prison. I just want one thing. I want to see you suffer. You put me in prison, I will drag you into court, I will put your name in the newspapers. I promise you, you bitch, one way or the other, I'm going to bring you down." Those statements, along with the look on the petitioner's face, caused Bryant great distress.[5] The petitioner made a similarly threatening telephone call to Bryant's residence.

On May 28, 1996, Bryant and the building manager of the church, Samuel Barrows, waited in her office so that she could return the balance of the petitioner's

[5] Bryant, concerned for her safety and that of her children, requested members of the church to spend the night at her home.

money to him.[6] After she gave him the money, the petitioner stated: "Now, I am going to do what I have to do . . . ." After the petitioner left, Barrows cautioned Bryant that the petitioner's "face of hate meant business" and that she should contact the police. Bryant notified the police and obtained a restraining order against the petitioner. Criminal charges also were filed against the petitioner, alleging that he had sexually assaulted Bryant. As a result of those charges, a warrant was issued for his arrest.

A parole violation report was completed on June 5, 1996. It alleged that the petitioner violated his parole on the basis of his conduct on May 28, 1996, that led the Suffolk Superior Court to issue a restraining order for threats made to Bryant. The board of parole (board) issued a notice of parole violation to the petitioner that indicated that he had violated paragraph eleven of the conditions of his parole.[7] Specifically, the notice stated: "By virtue of your actions on or about [May 28, 1996] with respect to the following: Boston, Mass. Police Incident Report, Restraining Order issued by Suffolk Superior Court for threats on a life, and details found within said documents as well as the victim's statement, you are in violation of the above Parole condition."

A hearing was held before the board on January 7, 1997. At the conclusion of that hearing, the board revoked the petitioner's parole.[8] In a letter dated Janu-

---

[6] At that point, Bryant felt uncomfortable being alone with the petitioner and had asked Barrows to be present.

[7] One of the functions of the board is to determine whether a parolee has violated the terms of his or her release and, if so, whether a revocation of parole is appropriate. See generally *Hampton* v. *Manson*, 5 Conn. App. 343, 497 A.2d 1044 (1985).

[8] At the conclusion of the hearing, the board stated: "This panel has found reason to revoke your parole effective [as of] today's date, January 7, 1997, and our revocation is based upon the testimony and evidence presented to us today, and we found that your parole is not compatible with the welfare of society." The board also indicated that it did not make a finding with respect to whether the petitioner's conduct was also a criminal act.

ary 8, 1997, the board notified the petitioner of the reasons for the revocation. In the letter, the board specifically credited Bryant's testimony and explained that it had found that the petitioner's testimony lacked credibility. The board indicated that through Bryant's testimony, it was established that the petitioner had made unwanted sexual advances and contact with Bryant and had threatened her, resulting in the issuance of a restraining order by the Massachusetts court. The board ultimately found that the prior determination that his release on parole would not be incompatible with the welfare of society was therefore no longer valid.[9]

On December 27, 2001, the petitioner filed a four count petition for a writ of habeas corpus. On November 19, 2003, the court issued its memorandum of decision denying the petition. The court, inter alia, rejected the petitioner's claim that the phrase "incompatible with

[9] At oral argument before this court, the petitioner strenuously argued that our review is limited solely to his single statement made on May 28, 1996, in which he told Bryant, "Now, I am going to do what I have to do . . . ." He contends that the board found that isolated statement to be the only cause for the revocation of parole. We disagree for two reasons.

First, we note that the petitioner did not make that argument to the habeas court. It is well established that this court, absent unusual circumstances, declines to review claims not raised at trial. See *Brandy* v. *Commissioner of Correction*, 89 Conn. App. 387, 393 n.6, 873 A.2d 1061 (2005); *Mercado* v. *Commissioner of Correction*, 85 Conn. App. 869, 871, 860 A.2d 270 (2004), cert. denied, 273 Conn. 908, 870 A.2d 1079 (2005). Moreover, the petitioner did not raise the issue in his brief, which appellate courts generally have interpreted as the abandonment of the issue. See *Harris* v. *Commissioner of Correction*, 271 Conn. 808, 842 n.24, 860 A.2d 715 (2004).

Second, even if that argument were before us properly, we do not believe that the board's conclusions concerning the revocation of the petitioner's parole should be construed narrowly. As indicated, prior to the hearing, the petitioner was given ample notice that *his conduct on or about May 28, 1996*, would be scrutinized and reviewed by the board. The notice specifically indicated that the board relied on the police report, the parole violation report, the Massachusetts summons and retraining order and Bryant's statement. The board clearly and properly considered the petitioner's May 28, 1996 statement in the context of his behavior during the preceding weeks. The petitioner's argument to the contrary is unavailing.

the welfare of society" was unconstitutionally vague. On December 5, 2003, the court granted the petition for certification to appeal. Additional facts will be set forth as necessary.

On appeal, the sole issue raised by the petitioner is that the condition of his parole that his release not be "incompatible with the welfare of society" is unconstitutionally vague. Before we can reach the merits of his claim, however, we must first determine whether that condition is subject to a facial challenge or limited to consideration on the basis of the facts presented. We conclude that because the challenged condition does not substantially implicate the petitioner's first amendment rights, our review is limited to an as applied vagueness challenge.

At the outset, we set forth certain legal principles that guide our resolution of the petitioner's appeal. "[I]n passing upon the constitutionality of a legislative act, we will make every presumption and intendment in favor of its validity . . . . The party challenging a statute's constitutionality has a heavy burden of proof; the unconstitutionality must be proven beyond all reasonable doubt." (Internal quotation marks omitted.) *Rudy's Limousine Service, Inc.* v. *Dept. of Tranportation*, 78 Conn. App. 80, 89, 826 A.2d 1161 (2003); see also *Hammond* v. *Commissioner of Correction*, 259 Conn. 855, 876, 792 A.2d 774 (2002).[10] Accordingly, "[t]he court will indulge in every presumption in favor of the statute's constitutionality [and] [w]hen a question of constitutionality is raised, courts must approach it with caution, examine it with care, and sustain the legislation unless its invalidity is clear." (Citation omitted; internal quota-

[10] In the present case, the petitioner is challenging the condition imposed by the board, which is part of the executive branch of state government. The language that is the subject of his appeal, however, tracks the text of General Statutes § 54-125. See footnote 1. We conclude that the relevant legal principles apply equally to the challenged language in the present case.

tion marks omitted.) *State* v. *Long*, 268 Conn. 508, 521, 847 A.2d 862, cert. denied, 543 U.S 969, 125 S. Ct. 424, 160 L. Ed. 2d 340 (2004).

The petitioner has raised a constitutional vagueness challenge. Our Supreme Court has stated that "[t]he void for vagueness doctrine is a procedural due process concept that originally was derived from the guarantees of due process contained in the fifth and fourteenth amendments to the United States constitution. The Connecticut constitution also requires that statutes with penal consequences provide sufficient notice to citizens to apprise them of what conduct is prohibited. . . . The constitutional injunction that is commonly referred to as the void for vagueness doctrine embodies two central precepts: the right to fair warning of the effect of a governing statute or regulation and the guarantee against standardless law enforcement. . . . If the meaning of a statute can be fairly ascertained a statute will not be void for vagueness since [m]any statutes will have some inherent vagueness, for [i]n most English words and phrases there lurk uncertainties." (Citations omitted; internal quotation marks omitted.) *State* v. *Burton*, 258 Conn. 153, 158–59, 778 A.2d 955 (2001).[11]

We are also mindful of the petitioner's status as a parolee.[12] "We begin with the proposition that the revocation of parole is not part of a criminal prosecution and thus the full panoply of rights due a defendant in

---

[11] Indeed, "[a]mbiguity is, unfortunately, a common statutory ailment. A degree of vagueness is endemic in many statutes." *State* v. *Proto*, 203 Conn. 682, 698, 526 A.2d 1297 (1987).

[12] "The purpose of parole is to help individuals reintegrate into society as constructive individuals as soon as they are able, without being confined for the full term of the sentence imposed. It also serves to alleviate the costs to society of keeping an individual in prison. The essence of parole is release from prison, before completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence." (Internal quotation marks omitted.) *McLaughlin* v. *Bronson*, 206 Conn. 267, 273, 537 A.2d 1004 (1988).

such a proceeding does not apply to parole revocations." (Internal quotation marks omitted.) *Liistro* v. *Robinson*, 170 Conn. 116, 126, 365 A.2d 109 (1976); see also *Parham* v. *Warden*, 172 Conn. 126, 132, 374 A.2d 137 (1976). Furthermore, "parolees do not enjoy absolute liberty under the United States constitution, but only conditional liberty, dependent on their compliance with the conditions of their release." *State* v. *Whitfield*, 26 Conn. App. 103, 108, 599 A.2d 21 (1991).[13] Nevertheless, in the seminal case of *Morrissey* v. *Brewer*, 408 U.S. 471, 482, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972), the United States Supreme Court held that an individual released subject to parole conditions nevertheless has obtained a liberty interest protected by the fourteenth amendment. See also *Asherman* v. *Meachum*, 213 Conn. 38, 47, 566 A.2d 663 (1989). As we have noted, *"Morrissey* . . . makes it clear that the benefits that inure as a result of that liberty interest cannot be taken away without the parolee's being informed of the alleged parole violation and being given a hearing at which he can rebut the allegations." *Vincenzo* v. *Chairman, Board of Parole*, 64 Conn. App. 258, 262, 779 A.2d 843 (2001).[14]

---

[13] For example, a parolee may be searched by his or her parole officer if there is a mere suspicion that the parolee is violating the terms of his or her release. *State* v. *Whitfield*, supra, 26 Conn. App. 109. Additionally, the failure to abide by the conditions result in a return to imprisonment without the burden of an adversary criminal trial. See *Morrissey* v. *Brewer*, supra, 408 U.S. 483.

[14] More specifically, an individual's "parole may initially be revoked only upon a preliminary determination of probable cause, and finally revoked upon a later hearing at which the following minimum requirements of due process were satisfied: (a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a neutral and detached hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole." (Internal quotation marks omitted.) *Lee* v. *Board of Educa-*

It is undisputed that the petitioner possessed a liberty interest in his status as a parolee protected by the fourteenth Amendment.[15] The petitioner, however, contends that the action of the board in revoking his liberty on the basis of his statement to Bryant implicated his first amendment rights as well.[16] Accordingly, the petitioner argues that we should review the condition that his release not be incompatible with the welfare of society for vagueness on its face. We do not agree.

"The general rule is that the constitutionality of a statutory provision being attacked as void for vagueness is determined by the statute's applicability to the particular facts at issue. . . . To do otherwise, absent the appearance that the statute in question intrudes upon fundamental guarantees, particularly first amendment freedoms, would be to put courts in the undesirable position of considering every conceivable situation which might possibly arise in the application of [the statute]." (Citations omitted; internal quotation marks omitted.) *Packer* v. *Board of Education*, 246 Conn. 89, 105–106, 717 A.2d 117 (1998); see also *State* v. *Payne*, 240 Conn. 766, 777, 695 A.2d 525 (1997), overruled on other grounds, *State* v. *Romero*, 269 Conn. 481, 490, 849 A.2d 760 (2004); *State* v. *Bloom*, 86 Conn. App. 463, 467–68, 861 A.2d 568 (2004), cert. denied, 273 Conn. 911, 870 A.2d 1081 (2005).

Our Supreme Court has recognized an exception to that general rule. "In the cases where such first amendment guarantees as free speech and assembly are at

*tion*, 181 Conn. 69, 78, 434 A.2d 333 (1980), on appeal after remand sub nom. *Halpern* v. *Board of Education*, 231 Conn. 308, 649 A.2d 534 (1994); see also *Morrissey* v. *Brewer*, supra, 408 U.S. 489.

[15] The fourteenth amendment to the United States constitution, § 1, provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

[16] The first amendment to the United States constitution, made applicable to the states through the fourteenth amendment, provides in relevant part: "Congress shall make no law . . . abridging the freedom of speech . . . ."

issue, an indefinite statute may impermissibly inhibit the exercise of those freedoms. Those . . . sensitive to the perils posed by . . . indefinite language, avoid the risk . . . only by restricting their conduct to that which is unquestionably safe. Free speech may not be so inhibited. . . . Due to this chilling effect which vague statutes can exert on first amendment liberties, when those freedoms are at stake, the statute's constitutionality is tested for vagueness on its face. . . . Thus, in a first amendment context, a [petitioner] may challenge the validity of a statute's application to marginal situations even though his own conduct may clearly fall within the statute's proscriptions." (Citations omitted; internal quotation marks omitted.) *State* v. *Pickering*, 180 Conn. 54, 57 n.3, 428 A.2d 322 (1980); see also *State* v. *Ehlers*, 252 Conn. 579, 584–85, 750 A.2d 1079 (2000). Put another way, "[w]hen a penal statute implicates rights protected by the first amendment, the statute's meaning must be capable of precise ascertainment in order to repel a vagueness challenge because [w]here first amendment rights are at stake, vague laws may cause citizens to avoid constitutionally protected conduct for fear of incurring criminal prosecution." (Internal quotation marks omitted.) *State* v. *Charles*, 78 Conn. App. 125, 135, 826 A.2d 1172, cert. denied, 266 Conn. 908, 832 A.2d 73 (2003). The question before us, therefore, is whether the challenged parole condition implicated his first amendment rights. If so, then we must determine whether the condition passes a facial challenge to its constitutionality.[17] If, however, there are no first amendment concerns, then we limit our review to the facts of the present case.

We turn to our Supreme Court's opinion in *State* v. *DeLoreto*, 265 Conn. 145, 827 A.2d 671 (2003), for

[17] Our Supreme Court has explained that "[a] facial challenge . . . means a claim that the law is invalid in toto—and therefore incapable of any valid application." (Internal quotation marks omitted.) *Packer* v. *Board of Education*, supra, 246 Conn. 97 n.14.

guidance in resolving that question. In *DeLoreto*, the defendant was involved in two separate confrontations with members of the Wethersfield police department. Id., 148–50.[18] He was charged with two counts of breach of the peace in the second degree in violation of General Statutes § 53a-181 (a) (1), (3) and (5). *State* v. *DeLoreto*, supra, 150. Following his conviction on both counts, he appealed and claimed, inter alia, that § 53a-181 was unconstitutionally vague. Id., 151. Specifically, he argued that his conviction was based on protected speech and that the trial court improperly concluded that his statements to the officers constituted fighting words. Id., 152. The state argued, as an alternate ground for affirming the defendant's conviction, that the statements constituted true threats. Id. Our Supreme Court agreed with the state's alternate ground for affirming the judgment of the trial court. Id.

The court first set forth the applicable standard of review. "[An appellate court's] duty is not limited to

[18] The first incident involved the defendant in *DeLoreto* and Robert Labonte, a Wethersfield police officer. Labonte was jogging and noticed a car driving slowly behind him and recognized the defendant as the operator. *State* v. *DeLoreto*, supra, 265 Conn. 148. The defendant had named Labonte as a defendant in a civil action that had been filed in federal court. Id. The defendant directed an obscene hand gesture toward Labonte and threatened to "kick [Labonte's] ass." (Internal quotation marks omitted.) Id. The defendant then stopped his vehicle in front of Labonte, opened the door and threatened him again. Id., 148–49. He then drove past Labonte, got out of the vehicle and ran toward Labonte, verbally threatening him and causing him to prepare to defend himself. Id., 149.

The second incident, which occurred six days after the first, involved the defendant and Andrew Power, who was also a Wethersfield police officer. Id. Power was at a convenience store and encountered the defendant, who was attempting to read Power's name badge. Id. Power told the defendant his name and asked him to refrain from making an obscene hand gesture at Power, which the defendant had done five to ten times prior to their meeting. Id., 149–50. The defendant acted aggressively toward Power, who assumed a defensive position. Id., 150. The defendant then followed Power out of the store and told him several times that he was going to "kick [Power's] punk ass" and continued to yell at Powers until he left. (Internal quotation marks omitted.) Id.

the elaboration of constitutional principles; we must also in proper cases review the evidence to make certain that those principles have been constitutionally applied. This is such a case, particularly since the question is one of alleged trespass across the line between speech unconditionally guaranteed and speech which may legitimately be regulated. . . . In cases where that line must be drawn, the rule is that we examine for ourselves the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect. . . . We must make an independent examination of the whole record . . . so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression." (Internal quotation marks omitted.) Id., 152–53. The appropriate standard of review, therefore, is de novo. Id., 153.

The court next identified the important legal principles relevant to the "true threats" doctrine in free speech jurisprudence. "The hallmark of the protection of free speech is to allow free trade in ideas—even ideas that the overwhelming majority of people might find distasteful or discomforting. . . . Thus, the First Amendment ordinarily denies a State the power to prohibit dissemination of social, economic and political doctrine which a vast majority of its citizens believes to be false and fraught with evil consequence. . . . The First Amendment affords protection to symbolic or expressive conduct as well as to actual speech. . . .

"The protections afforded by the First Amendment, however, are not absolute, and we have long recognized that the government may regulate certain categories of expression consistent with the Constitution. . . . The First Amendment permits restrictions upon the content of speech in a few limited areas, which are of such

slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. . . .

"Thus, for example, a State may punish those words which by their very utterance inflict injury or tend to incite an immediate breach of the peace. . . . Furthermore, the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action. . . . And the First Amendment also permits a State to ban a true threat. . . .

"*True threats encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. . . . The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats protect[s] individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur. . . . Virginia v. Black,* 538 U.S. 343, 359–60, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003).

"The United States Court of Appeals for the Fifth Circuit has articulated the rationale underlying the removal of true threats from first amendment protection. The notion that some expression may be regulated consistent with the first amendment . . . starts with the already familiar proposition that expression has special value only in the context of dialogue: communication in which the participants seek to persuade, or are persuaded; communication which is about changing or maintaining beliefs, or taking or refusing to take action on the basis of one's beliefs . . . . It is not plausible to uphold the right to use words as projectiles

where no exchange of views is involved. . . . *Schackelford* v. *Shirley*, 948 F.2d 935, 938 (5th Cir. 1991), quoting L. Tribe, American Constitutional Law (2d Ed. 1988) § 12-8, pp. 836–37.

"That court further stated that, [a]s speech strays further from the values of persuasion, dialogue and free exchange of ideas the first amendment was designed to protect, and moves toward threats made with specific intent to perform illegal acts, the state has greater latitude to enact statutes that effectively neutralize verbal expression. *Schackelford* v. *Shirley*, supra, 948 F.2d 938. Finally, that court concluded that, *as expansive as the first amendment's conception of social and political discourse may be, threats made with specific intent to injure and focused on a particular individual easily fall into that category of speech deserving no first amendment protection.* Id. Thus, we must distinguish between true threats, which, because of their lack of communicative value, are not protected by the first amendment, and those statements that seek to communicate a belief or idea, such as political hyperbole or a mere joke, which are protected. See *Watts* v. *United States*, 394 U.S. 705, 708, 89 S. Ct. 1399, 22 L. Ed. 2d 664 (1969) (statement that speaker would shoot president of United States made at political rally constituted protected political hyperbole).

"*In the context of a threat of physical violence, [w]hether a particular statement may properly be considered to be a threat is governed by an objective standard—whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault.* . . . Although a threat must be distinguished from what is constitutionally protected speech . . . this is not a case involving statements with a political message. *A true threat, where a reasonable person would foresee that the lis-*

*tener will believe he will be subjected to physical vio-*
*lence upon his person, is unprotected by the first*
*amendment. . . .* Moreover, [a]lleged threats should
be considered in light of their entire factual context,
including the surrounding events and reaction of the
listeners." (Citation omitted; emphasis added; internal
quotation marks omitted.) *State* v. *DeLoreto,* supra, 265
Conn. 153–56.

We begin, therefore, by independently reviewing the
incidents involving the petitioner and Bryant to deter-
mine "whether a reasonable person would foresee that
the statement would be interpreted by those to whom
the maker communicates the statement as a serious
expression of intent to harm or assault." (Internal quota-
tion marks omitted.) Id., 156. We conclude, on the basis
of our de novo review of the entire factual context, that
a reasonable person would believe that the petitioner
communicated a serious expression of an intent to com-
mit an act of unlawful violence on Bryant.[19]

As we have stated, the petitioner formed an attach-
ment to Bryant and quickly became possessive of her.
Bryant rejected his sexual overtures and, following her
return from the three day conference, he became
"deadly cold." He told Bryant that he did not care what
happened to him as long as she suffered, and that she
was a "fucking bitch" and that her "ass [was] grass."
He promised to "bring [her] down" and stated that she
was "history." After receiving his money from Bryant,
the petitioner told her that he was going do what he

---

[19] In *Watts* v. *United States,* supra, 394 U.S. 708, the United States Supreme
Court concluded that a direct threat to shoot President Lyndon Johnson
made during a public rally on the Washington Monument grounds, *viewed
in context,* constituted protected political speech. It is clear that a court
must consider the context in which the challenged statement was made. In
the present case, the context of the petitioner's statement leads us to the
conclusion that it was not protected speech, but was a true threat directed
at Bryant. See id.

had to do. Barrows, who was present when that statement was made, described the petitioner has having a "face of hate . . . ."

Whether the petitioner actually intended to assault Bryant physically at the time he made the statements is of no consequence to our analysis. As our Supreme Court explained, "[i]mminence, however, is not a requirement under the true threats doctrine. *Virginia* v. *Black*, supra, 538 U.S. 359–60 (True threats encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. . . . The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats protect[s] individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur. . . . *In re M.S.*, 10 Cal. 4th 698, 711, 896 P.2d 1365, 42 Cal. Rptr. 2d 355 (1995) (The [defendants] err, however, in assuming the First Amendment always requires the threatened harm be imminent for the threat to be constitutionally punishable. It does not.)." (Internal quotation marks omitted.) *State* v. *DeLoreto*, supra, 265 Conn. 158–59.

The petitioner's parole condition that he has challenged on vagueness grounds is not aimed directly at activity protected by the first amendment. Cf. *Coates* v. *Cincinnati*, 402 U.S. 611, 616, 91 S. Ct. 1686, 29 L. Ed. 2d 214 (1971). The petitioner's parole was not revoked because he was engaging in the free trade of ideas by speech or conduct, whether expressive or symbolic, that is protected by the first amendment. See *Virginia* v. *Black*, supra, 538 U.S. 358; cf. *State* v. *Proto*, 203 Conn. 682, 692–95, 526 A.2d 1297 (1987) (provisions of campaign act implicated freedom of expression protected by first amendment). It was revoked because he

engaged in a pattern of behavior that encompassed a series of statements and actions that a reasonable person would find to be a "true threat."

In *State* v. *Crudup*, 81 Conn. App. 248, 838 A.2d 1053, cert. denied, 268 Conn. 913, 845 A.2d 415 (2004), this court concluded that the threat, "I should pop you," was not entitled to constitutional protection. (Internal quotation marks omitted.) Id., 259. We reach a similar conclusion in the present case. Because "true threats" do not fall within the broad class of protected speech, the petitioner's vagueness challenge does not implicate the first amendment. A facial challenge, therefore, is not warranted, and we test the challenged parole condition for vagueness only as to the facts of the present case.

As we have noted, "[i]n order to challenge successfully, on due process grounds, the vagueness of [any] statute as applied to [the] particular facts [of his case] . . . [the petitioner] . . . must show . . . (1) [that] the statute does not provide fair warning that it applies to the conduct at issue, or (2) that he was the victim of arbitrary enforcement practices." (Internal quotation marks omitted.) *State* v. *Bloom*, supra, 86 Conn. App. 469. We further explained that "[t]he proper test for determining [whether] a statute is vague as applied is whether a reasonable person would have anticipated that the statute would apply to his or her particular conduct. . . . The test is objectively applied to the actor's conduct and judged by a reasonable person's reading of the statute . . . . When we apply these principles . . . our fundamental inquiry is whether a person of ordinary intelligence would comprehend that the [petitioner's] acts were prohibited under the ordinance." (Citations omitted; internal quotation marks omitted.) Id.; see also *State* v. *Crudup*, supra, 81 Conn. App. 263–64.

We conclude that a reasonable person of ordinary intelligence would be on fair notice that the threatening conduct exhibited by the petitioner violated the condition that his release not be "incompatible with the welfare of society."[20] The record indicates that the petitioner touched Bryant in an inappropriate sexual manner, and directed numerous threatening statements and actions toward her after she had invited him to attend her church and offered him assistance. Those actions resulted in a complaint to the Boston police department, the filing of criminal charges and the issuance of a restraining order by the Massachusetts court. To be sure, we are mindful of the constitutional requirement that definiteness applies more strictly to those statutes with penal consequences rather than those merely with civil consequences. *State* v. *Schriver*, 207 Conn. 456, 460, 542 A.2d 686 (1988). Nevertheless, under those facts and circumstances, we conclude that a reasonable person would foresee that such conduct was not compatible with the welfare of society. The challenged condition of the petitioner's parole, therefore, passes constitutional muster and survives his vagueness challenge on an as applied basis.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[20] "The proscription of the activity, however, need not be definite as to all aspects of its scope. A statute is not unconstitutional merely because a person must inquire further as to the precise reach of its prohibitions. . . . (It is not necessary . . . that a statute list the precise conduct prohibited or required. . . . It is recognized that the law may be general in nature; the constitution requires no more than a reasonableness of certainty. . . .)" (Citations omitted; internal quotation marks omitted.) *State* v. *DeFrancesco*, 235 Conn. 426, 443–44, 668 A.2d 348 (1995); see also *Packer* v. *Board of Education*, supra, 246 Conn. 101.